1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11

J. ANGELO CORLETT, Ph.D., an
individual,

Case No.:  24-CV-78 TWR (MPP)

12

Plaintiff,

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR JUDGMENT ON THE
PLEADINGS**

13

v.

14

15

WILLIAM TONG, in his individual and
official capacities; MONICA J. CASPER,
in her individual and official capacities;
and DOES 1 through 50, inclusive,

(ECF No. 15)

16

17

Defendants.

18

19

20

Presently before the Court is the Motion for Judgment on the Pleadings ("Mot.,"

21

ECF No. 15) filed by Defendants William Tong and Monica J. Casper, in their individual

22

and official capacities, as well as Plaintiff J. Angelo Corlett, Ph.D.'s Opposition to

23

("Opp'n," ECF No. 18) and Defendants' Reply in Support of ("Reply," ECF No. 20) the

24

Motion.  The Court held a hearing on September 5, 2024.  (*See* ECF No. 23.)  Having

25

carefully considered the Parties' pleadings (ECF No. 1 ("Compl."), ECF No. 8 ("Ans.")),

26

those documents properly subject to judicial notice or incorporated by reference therein,

27

the Parties' arguments, and the relevant law, the Court **GRANTS IN PART AND**

28

**DENIES IN PART** Defendants' Motion, as follows.

# BACKGROUND

## I.    Requests for Judicial Notice

When deciding a motion under Federal Rule of Civil Procedure 12(c), the Court accepts as true the allegations in Plaintiff's Complaint, *see Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)), and "may take judicial notice of undisputed matters of public record" and incorporate by reference "documents not attached to a complaint . . . if no party questions their authenticity and the complaint relies on those documents."  *See id.* at 1132 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)).  Because both sides have presented the Court with various exhibits, the Court must determine whether they are appropriately considered for purposes of Defendants' Motion.

### A.    *Judicial Notice*

"Judicial notice under Rule 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'"  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)).  "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'"  *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)).  "Accordingly, '[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.'"  *Id.* (quoting *Lee*, 250 F.3d at 689 (alteration in original)).  "But a court cannot take judicial notice of disputed facts contained in such public records."  *Id.* (quoting *Lee*, 250 F.3d at 689).

Defendants request that the Court take judicial notice of the following exhibits:

1.    **Relevant portions of [San Diego State University ("SDSU")]'s Nondiscrimination Policy.**   [California State University **(**"CSU")] Policy Prohibiting Discrimination, Harassment, Sexual Misconduct, Sexual Exploitation, Dating Violence, Domestic Violence, Stalking, and Retaliation (Nondiscrimination Policy), Articles I–IV, VII(A)–B (Jan. 1, 2022).  Also available at https://perma.cc/97C8-43LU.

2. **Relevant portions of SDSU University Senate Policy File.**   San Diego State University, University Senate, Policy File, AY 2023–2024, Sections on Freedom of Expression and Academic Freedom.

3. **CSU Standing Order.**   Standing Order of the Board of Trustees of the California State University (adopted March 15, 2006).

(ECF No. 15-4 ("RJN") at 2 (emphasis in original); *see also id.* at 3–4, 7–17 ("Defs.' Ex. 1"),[1] 18–27 ("Defs.' Ex. 2"),[2] 28–33 ("Defs.' Ex. 3").)  Defendants note that "[t]he Court may take judicial notice of the 'records and reports of administrative bodies[,]'" (*see* RJN at 3 (quoting *Mack v. S. Bay Beer Distrib., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986)) (citing *Thomas v. Regents of Univ. of Cal.*, 2020 WL 3892860, at *5 (N.D. Cal. July 10, 2020))), and that a public state university is such an administrative body.  (*See id.* at 3–4 (citing *Mitchell v. Los Angeles Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988); *Ishimatsu v. Regents of the Univ. of Cal.*, 266 Cal. App. 2d 854, 864 (1968)).)  Plaintiff does not oppose Defendants' Request.  (*See generally* Opp'n.)

As Defendants argue, Defendants' Exhibits 1 through 3 are proper subjects of judicial notice.  Further, Defendants' Exhibits 1 and 2 are clearly relevant to Plaintiffs' Complaint because they are the standards against which Plaintiff's conduct was evaluated.  Indeed, Plaintiffs' third cause of action hinges on the vagueness of SDSU's Nondiscrimination Policy, (*see* Compl. ¶¶ 176–82), and his fourth cause of action is premised on Defendants' violation of the CSU Senate Policies regarding "Freedom of Expression" and "Academic Freedom."  (*See* Compl. ¶¶ 189–93.)  The Court therefore **GRANTS** Defendants' Request for Judicial Notice as to Defendants' Exhibits 1 and 2.

/ / /

---

[1]   Defendants also submitted Exhibit 1 as Exhibit E to Dr. Tong's Declaration.  (*See* ECF No. 15-3 ("Tong Decl.") ¶ 7; *see also id.* at 99–109 ("Defs.' Ex. E").)

[2]   Defendants also submitted Exhibit 2 as Exhibit D to Dr. Tong's Declaration.  (*See* Tong Decl. ¶ 6; *see also id.* at 89–98 ("Defs.' Ex. D").)

As for Defendants' Exhibit 3, Defendants' only citation was in support of their contention that "[t]he Board of Trustees . . . delegated to campus Presidents the authority 'to take whatever actions are necessary' to manage their campuses[,] . . . includ[ing] the authority to supervise and discipline employees." (*See* Mem. at 21.)  Because this fact is not necessary to the Court's analysis, the Court **DENIES** Defendants' Request for Judicial Notice as to Defendants' Exhibit 3.

### B.   Incorporation by Reference

"Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002.  "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *superseded by statute on other grounds as recognized in Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 681–82 (9th Cir. 2006)).

"[A] defendant may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)).  "'[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document' under *Ritchie*." *Id.* (quoting *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).  "However, if the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Id.*  "Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims." *Id.* (first citing *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 995–96 (S.D. Cal. 2005); then citing *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156–57 (2d Cir. 2006)).

Defendants ask the Court to incorporate by reference the following exhibits into Plaintiff's Complaint:

24-CV-78 TWR (MPP)

4. **Confidential Report of Investigation.** *Confidential Report of Investigation*, prepared by Jodi Cleesattle, Supervising Deputy Attorney General, California Department of Justice (Dec. 15, 2022).

5. **External Reviewers' Report.** *External Reviewers' Report*, San Diego State University, Philosophy (submitted Nov. 13, 2023).

6. **Notice of Pending Disciplinary Action.** *Notice of Pending Disciplinary Action*, San Diego State University (Aug. 23, 2023).

7. **Plaintiff's Grievance.** J. Angelo Corlett, Grievance Form, Unit 3, (April 11, 2022).

8. **Defendants' Level I Response.** *Level I Response – Grievance, R03-2022-098,* San Diego State University (Jul. 25, 2022).

9. **Plaintiff's Level I Grievance Appeal.** Arthur I Willner Esq., on behalf of Dr. J. Angelo Corlett, *Level I Grievance Appeal, Grievant: Dr. J. Angelo Corlett, Grievance R03-2022-098* (Aug. 8, 2022).

10. **Defendants' Denial of Grievance.** Decision, Faculty Hearing Committee, (Jan. 31, 2023).

(RJN at 2–3 (emphasis in original); *see also id.* at 4–5, 34–93 ("Defs.' Ex. 4"),[3] 94–105 ("Defs.' Ex. 5"),[4] 106–118 ("Defs.' Ex. 6"),[5] 119–21 ("Defs.' Ex. 7"), 122–29 ("Defs.' Ex. 8"),[6] 130–62 ("Defs.' Ex. 9"), 163–71 ("Defs.' Ex. 10").) Defendants contend that incorporation by reference is appropriate "because Plaintiff references these documents extensively through his Complaint and the documents are, in fact, the basis for Plaintiff's

---

[3]   Defendants also submitted Exhibit 4 as Exhibit A to Dr. Tong's Declaration. (*See* Tong Decl. ¶ 3; *see also id.* at 4–15 ("Defs.' Ex. A").)

[4]   Defendants also submitted Exhibit 5 as Exhibit B to Dr. Tong's Declaration. (*See* Tong Decl. ¶ 4; *see also id.* at 16–75 ("Defs.' Ex. B").)

[5]   Defendants also submitted Exhibit 6 as Exhibit C to Dr. Tong's Declaration. (*See* Tong Decl. ¶ 5; *see also id.* at 76–88 ("Defs.' Ex. C").)

[6]   The Court relies on the corrected version of Exhibit 8 that Defendants filed at ECF No. 19.

causes of action."  (*See* RJN at 5 (citing Compl. ¶¶ 66–68, 73–80, . . . *passim*).)  Plaintiff does not oppose Defendants' Request.  (*See generally* Opp'n.)

Each of Defendants' Exhibits 4 through 10 are cited extensively in Plaintiffs' Complaint,[7] their authenticity is not disputed, and they are central to Plaintiffs' claims. The Court therefore concludes that Defendants' Exhibits 4 through 10 are properly incorporated by reference into Plaintiff's Complaint and **GRANTS** Defendants' Request for Judicial Notice as to Exhibits 4 through 10.

### C.   *Plaintiff's Additional Exhibits*

In support of Plaintiff's Opposition, his counsel also submitted a Declaration attaching four exhibits: (1) a letter from the Foundation for Individual Rights and Expression ("FIRE") to the President of SDSU dated March 10, 2022, and signed by over 160 faculty from universities around the world, (*see* ECF No. 18-1 ("Willner Decl.") ¶ 2; *see also id.* at 4–20 ("Pl.'s Ex. 1")[8]); (2) a letter from Dr. Nathan Salmon dated October 16, 2022, that was offered into evidence at Plaintiff's grievance hearing, (*see* Willner Decl. ¶ 3; *see also id.* at 21–23 ("Pl.'s Ex. 2")); (3) Response to Philosophy External Review, 2023 signed by Professions Sandra Wawrytko, Robert Francescotti, and Steve Barbone, (*see* Willner Decl. ¶ 4; *see also id.* at 24–26 ("Pl.'s Ex. 3")); and (4) Plaintiffs' proofs of service on Defendants in their official capacities through CSU's Office of General Counsel, (*see* Willner Decl. ¶ 6; *see also id.* at 27–33 ("Pl.'s Ex. 4")).  Although Plaintiff did not formally request judicial notice or incorporation by reference of these documents, the Court will consider whether it may properly consider any of these exhibits in evaluating Defendant's Motion.

---

[7]   Specifically, paragraphs 95 through 116 of Plaintiff's Complaint discuss Defendants' Exhibit 4, paragraphs 147 through 156 Defendants' Exhibit 5, paragraphs 131 through 132 Defendants' Exhibit 6, paragraph 66 Defendants' Exhibit 7, paragraphs 68 through 71 Defendants' Exhibit 8, paragraph 73 Defendants' Exhibit 9, and paragraphs 74 through 80 Defendants' Exhibit 10.

[8]   The FIRE letter was also attached as Exhibit C to Plaintiff's Level I Grievance Appeal, which Defendants filed as Exhibit 9.  (*See* Defs.' Ex. 9 at 152–62.)

Regarding Plaintiff's Exhibits 1 and 2, the FIRE letter and letter from Dr. Salmon are both referenced in Plaintiff's Complaint, (*see* Compl. ¶¶ 65, 76, respectively), their authenticity is not disputed, and they were part of the record before the outside investigator and SDSU.  The Court therefore concludes that Plaintiff's Exhibits 1 and 2 are properly incorporated by reference into Plaintiff's Complaint.

As for Plaintiff's Exhibit 3, although Plaintiff discusses the external review itself at length in his Complaint, (*see id.* ¶¶ 147–56), the proffered response is not mentioned.  (*See generally id.*)  Further, the exhibit is undated, and Mr. Willner does not provide any context regarding when the response was written or to whom it was sent.  As a result, the Court is unable to determine the response's relevance to the conduct alleged in the Complaint.  The Court therefore **DECLINES** to take judicial notice of or incorporate by reference Plaintiff's Exhibit 3.

Finally, as to Plaintiff's Exhibit 4, the proofs of service are already part of the Court's record at ECF Nos. 21 and 22.  The Court therefore **DENIES AS MOOT** Plaintiff's request that the Court take judicial notice of Plaintiff's Exhibit 4.

## II.    Relevant Factual Background

### A.    Dr. Corlett

Plaintiff is a tenured full Professor in SDSU's Department of Philosophy.  (*See* Compl. ¶¶ 13, 17.)  "[H]is areas of specialty include, among others, ethics, social and political philosophy, academic freedom, and the philosophy of law including issues pertaining to racism, justice, and the use of language." (*Id.* ¶ 17.)

Plaintiff has been teaching at SDSU for over 25 years.  (*See id.*)  During that time, he "has consistently received positive course evaluations given by students in classes he has taught, and has won about a dozen teaching awards, despite having the reputation of being the Philosophy Department's toughest grader." (*See id.* ¶ 18.)  In his March 19, 2021 Periodic Review of Tenured Faculty, Dr. Steve Barbone, Chair of SDSU's Philosophy Department, noted "the breathtaking scope and depth of [Plaintiff]'s achievements during [the 2015–2020 review period]." (*See id.* ¶ 23 (alteration in original).)  Dr. Barbone added

that Plaintiff's "professional achievements 'd[id] not in any way seem to inhibit [his] being a very successful instructor'" and that "[i]t [wa]s also not surprising that students would nominate [Plaintiff] for various teaching awards here at San Diego State." (*See id.*)

Plaintiff is also widely published. (*See id.* ¶ 17.) In February 2019, Plaintiff published an essay entitled "Offensiphobia" in the Journal of Ethics. (*See id.* ¶ 20.) In that essay, Plaintiff defined "offensiphobia" as "the belief that higher educational academic freedom ought to be to some important extent censured because of the mere offensiveness of certain kinds of expressions, whether those expressions are perceived as being racist, sexist, etc., effectively holding that the offensiveness of such expressions is a sufficient condition to justify its prohibition." (*See id.*) Plaintiff has also published the monographs "Race, Racism and Reparations" (Cornell University Press, 2003) and a chapter entitled "'For All My Niggaz and Bitches': Ethics and Epithets," appearing in book 16 of the Popular Culture and Philosophy Series, "Hip-Hop and Philosophy: Rhyme 2 Reason" (Open Court, 2005). (*See* Compl. ¶ 22; *see also* https://www.goodreads.com/series/64823-popular-culture-and-philosophy.)

### B.   *Relevant Policies*

#### 1.   *SDSU's Senate Policy File*

##### a.   Freedom of Expression

SDSU's Senate Policy File regarding "Freedom of Expression" "[r]ecogniz[es] that the principles established in the First Amendment of the United States Constitution, Article 1, Section 2 of the Constitution of the State of California, and the California Education Code (sec. 66301) apply to all faculty, staff, and/or students." (*See* Defs.' Ex. 2 at 25, § 1.0; *see also* Compl. ¶ 26.) SDSU therefore "affirms":

> Freedom of expression is a tenet of higher education; is integral to the mission of the University and to its students, staff, and faculty; is a central and inviolate freedom to learn and teach; necessary for an educated populace; is a requisite to a free society; is incompatible with the suppression of opinions; is incompatible with prior restraint; encompasses forms of expression other than speech; and defends the expression we abhor as well as the expression we support.

(*See* Defs.' Ex. 2 at 25, § 1.1; *see also* Compl. ¶ 27.)

As to scope, "the intent of th[e] policy is to provide as much opportunity for freedom of expression, as is consistent with the limits of the law" and SDSU's regulations, (*see* Defs.' Ex. 2 at 25, § 2.2; *see also* Compl. ¶ 28), which "may be designed to avoid disruption of the mission of the university, particularly academic instructions, research and creative activity or to protect campus security." (*See* Defs.' Ex. 2 at 25, § 2.1; *see also* Compl. ¶ 28.) Consequently, the exercise of free speech is "subject to appropriate time, place, and manner regulations," although "[r]egulation of noncommercial free speech and free expression activities shall be content neutral" and "[a]ll legal speech, even offensive speech[,] is permitted." (*See* Defs.' Ex. 2 at 25, § 3.1; *see also* Compl. ¶ 30.)

### b.    Academic Freedom

SDSU's Senate Policy File separately addresses "Academic Freedom," (*see* Defs.' Ex. 2 at 27; *see also* Compl. ¶ 31), which "should be defended by faculty, instructional staff, and students" in light of SDSU's "commit[ment] to academic freedom as a core value that underlies its mission of teaching, scholarship and creative activity, and service to the public, our University, and the larger scholarly community." (*See* Defs.' Ex. 2 at 27; *see also* Compl. ¶ 32.)   In "seek[ing] to develop in its students a sense of thoughtful independence," SDSU "recognize[s] that students, faculty, and instructional staff must be free within the classroom and through scholarly research, creative activity, and community service to explore the widest possible range of viewpoints." (*See* Defs.' Ex. 2 at 27; *see also* Compl. ¶ 33.)

SDSU "also endorses the following portion of the American Council on Education's Statement on Academic Rights and Responsibilities:"

> The validity of academic ideas, theories, arguments and views should be measured against the intellectual standards of relevant academic and professional disciplines.  Application of these intellectual standards does not mean that all ideas have equal merit.  The responsibility to judge the merit of competing academic ideas rests with colleges and universities and is determined by reference to the standards of the academic profession.

9

1   (*Id.*)

2               2.      *CSU's Nondiscrimination Policy*

3                   a.      Academic Freedom and Freedom of Speech

4       CSU's Nondiscrimination Policy also addresses academic freedom and freedom of

5   speech:

> Freedom of expression is a cornerstone of a democratic society and is essential
> to the educational process.  Universities have a special obligation not only to
> tolerate, but also to encourage and support, the free expression of ideas,
> values, and opinions, even when unpopular or controversial.  At the same
> time, the exercising of freedom of expression and assembly must comply with
> all applicable federal, state, and local laws and CSU policy.  Speech activity
> is not protected by the First Amendment to the U.S. Constitution or by this
> Nondiscrimination Policy when it includes terrorist threats or the promotion
> of actual or imminent physical violence or bodily harm.  Freedom of
> expression is not an absolute right.  It coexists with other rights and the need
> for public order and safety.
>
> Not every act that may be offensive or insulting constitutes Discrimination or
> Harassment, as defined by law and this Nondiscrimination Policy.  At the
> same time, all members of the campus community should recognize that the
> manner in which they choose to express themselves has consequences and that
> freedom of expression includes a responsibility to acknowledge and respect
> the right of others to express differing opinions.  Conduct that violates this
> Nondiscrimination        Policy,     including      statements      that     constitute
> Discrimination, Harassment, Sexual Harassment, Retaliation or Stalking, is
> not protected by academic freedom or freedom of expression.

21   (*See* Defs.' Ex. 1 at 9–10, Art. IV.)

22                   b.      Prohibited Conduct

23      As is relevant to this action, CSU's Nondiscrimination Policy prohibits:

24      A.      Discrimination based on any Protected Status: i.e., Age, Disability (physical
        and mental), Gender (or sex, including sex stereotyping), Gender Identity
        (including transgender), Gender Expression, Genetic Information, Marital
        Status, Medical Condition, Nationality, Race or Ethnicity (including color,
        caste, or ancestry), Religion (or religious creed), Sexual Orientation, and
        Veteran or Military Status.

B.     Harassment based on any Protected Status.

C.     Sexual Harassment, including hostile environment and *quid pro quo* ("this for that").

(*See* Defs.' Ex. 1 at 8–9 Art. II.)

The Nondiscrimination Policy defines "Discrimination" as:

**Adverse Action(s)** against a Complainant **because of** their Protected Status.

a.     **Adverse Action** means an action engaged in by the Respondent that has a substantial and material adverse effect on the Complainant's ability to participate in a university program, activity, or employment.  Minor or trivial actions or conduct not reasonably likely to do more than anger or upset a Complainant does not constitute an Adverse Action.

. . .

b.     If Adverse Action is taken **because of** a Complainant's Protected Status, that means that the Complainant's Protected Status is a substantial motivating reason (but not necessarily the only reason) for the Adverse Action.

(*See* Defs.' Ex. 1 at 11, Art. VII.A.1 (emphasis in original).)

The Nondiscrimination Policy defines "Harassment" as:

unwelcome verbal, nonverbal or physical conduct engaged in **because of** an individual Complainant's Protected Status.

If a Complainant is harassed **because of** their Protected Status, that means that the Complainant's Protected Status is a substantial motivating reason (but not necessarily the only reason) for the conduct.

Harassment may occur when:

a.     Submitting to, or rejecting, the verbal, nonverbal or physical conduct is explicitly or implicitly a basis for:

. . .

II.     Decisions that affect or threaten the Complainant's academic status or progress, or access to benefits and services, honors, programs, or activities available at or through the university.

**OR**

b. The conduct is sufficiently severe or pervasive so that its effect, whether intended or not, could be considered by a reasonable person under similar circumstances and with similar identities, and is in fact considered by the Complainant[,] as creating an intimidating, hostile or offensive work or educational environment that denies or substantially limits an individual's ability to participate in or benefit from employment and/or educational, services, activities, or other privileges provided by the CSU.

Harassment includes, but is not limited to, verbal harassment (e.g., epithets, derogatory comments, or slurs), physical harassment (e.g., assault, impeding or blocking movement, or any physical interference with normal work or movement), and visual forms of harassment (e.g., derogatory posters, cartoons, drawings, symbols, or gestures.).   Single, isolated incidents will typically be insufficient to rise to the level of harassment.

(*See* Defs.' Ex. 1 at 11–12, Art. VII.A.2 (emphasis in original); *see also* Compl. ¶ 35.)

Finally, the Nondiscrimination Policy defines "Sexual Harassment" as

Unwelcome verbal, nonverbal or physical conduct of a sexualized nature that includes, but is not limited to, sexual advances, requests for sexual favors, offering employment benefits or giving preferential treatment in exchange for sexual favors, or indecent exposure, and any other conduct of a sexual nature where:

a. Submission to, or rejection of, the conduct is explicitly or implicitly used as the basis for any decision affecting a Complainant's academic status or progress, or access to benefits and services, honors, programs, or activities available at or through the university; or

. . .

c. The conduct is sufficiently severe, persistent, or pervasive that its effect, whether or not intended, could be considered by a reasonable person in the shoes of the Complainant, and is in fact considered by the Complainant, as limiting their ability to participate in or benefit from the services, activities or opportunities offered by the university; or

d. The conduct is sufficiently severe, persistent, or pervasive that its effect, whether or not intended, could be considered by a reasonable

person in the shoes of the Complainant, and is in fact considered by the Complainant, as creating an intimidating, hostile or offensive environment.

. . .

Claiming that the conduct was not motivated by sexual desire is not a defense to a complaint of Sexual Harassment.

(*See* Defs.' Ex. 1 at 14–15, Art. VII.A.4.)

### C.   *Dr. Corlett's Spring 2022 Classes*

In spring semester of 2022, Plaintiff was assigned to teach three classes: (1) Philosophy 200 (Critical Thinking and Composition), (2) Philosophy 328 (Philosophy, Racism and Justice), and (3) Philosophy 512 (Political Philosophy).  (*See* Defs.' Ex. 4 at 35, 49; *see also* Compl. ¶ 39.[9])

#### 1.   *Philosophy 200*

Philosophy 200 is a General Education, entry-level Philosophy course.  (*See* Defs.' Ex. 4 at 50.)  Because it is a lower-division class, most students enrolled in it are freshmen and sophomores.  (*See id.*)  Twenty-eight students were enrolled in Plaintiff's Philosophy 200 course in Spring 2022.  (*See id.*)

At that time, Plaintiff had been teaching Philosophy 200 for approximately five years.  (*See id.*)  Plaintiff's syllabus described Philosophy 200 as "a writing class designed to teach the students about components of arguments and logical fallacies, as well as how to craft arguments for specific audiences."  (*See id.*)  It also included the following "Content and Style Advisory" in "red boldface print on the second and third pages[:]"

Due to the sensitive nature of some of the topics that are covered in this course taught at a public adult higher-education institution which is bound to and protected by federal and state laws as well as the SDSU Senate Policy File, and the manner in which some such topics are sometimes presented or discussed in order to illustrate particular philosophical points or problems

---

[9]   The Complaint alleges that Plaintiff was assigned to teach two sections of Philosophy 328 and one section of Philosophy 200.  (*See* Compl. ¶ 39.)

related to the course material or sometimes as a provocative pedagogical method in order to provide students with a cognitive 'break' by way of cognitive engagement in order to refocus their attention on the material, students are forewarned that the provocative contents of this course, both in the assigned readings and the lectures and discussions, could possibly be construed as being offensive especially by those not having sufficient background in ethics and philosophy and by those suffering from certain psychological disorders.  Students are reminded that they themselves are legal adults and that both established law and the SDSU Senate Policy File most certainly protect such expressions, and that with equal certitude ethics requires students to utilize with due diligence their moral and civic responsibility to judge reasonably the diversity of views presented in this course.  There is, of course, _neither a legal nor a moral right to not be offended by mere words and their expression_!  So if a student is generally overly offended by certain words being used or mentioned and such offense is likely to cause them undue cognitive dissonance or some other emotional trauma that might interfere with their learning experience, they are _strongly advised to immediately seek enrollment in another course_ as SDSU Senate Policy File (2015, p. 47) protects "even offensive speech" in the classroom by any enrolled student or faculty member.  Such easily offended students are also advised to seek an appointment with SDSU Counseling & Psychological Services (see note below) for professional assistance with their being able to cope with such matters.  There will be no respect shown for the movement of political correctness in this course as it is a movement morally and legally pernicious.  No violation of anyone's legal or moral rights to academic freedom shall be tolerated in this course as whatever is expressed by Professor Corlett herein is fully protected by the First Amendment to the U.S. Constitution and the most recent U.S. Supreme Court cases interpreting it and laws pertaining to academic freedom, including _Cohen v. California_ (1971), _Hardy v. Jefferson Community College_ (2001), as well as the SDSU Senate Policy File noted above.  The quality of a university education and an adult learning experience is greatly contingent on the protections of academic freedom.  For more on such matters, see http://rdcu.be.HlFn and http://www.theatlantic.com/ magazine/archive/2015/09/the-coddling-of-the-american-mind/399356/,

Students are free to exit the classroom as they please during class sessions, SO LONG AS THEY DO SO QUIETLY AND DO NOT DISTURB OTHERS.  Students who leave the classroom during class sessions are advised to procure notes from other students for the time that they miss during their absence from class as students are responsible for learning the material covered during class sessions whether present or not in the sessions.

Offensiphobia will not be tolerated in this course as it violates the free speech rights of others.

(*See id.* at 50–51.)

### 2. Philosophy 512

Philosophy 512 is an upper-division course that is limited to upper level and graduate students. (*See* Defs.' Ex. 4 at 51–52.) Consequently, the students in Plaintiff's Sprin 2022 class "were primarily juniors, seniors and graduate students." (*See id.* at 51.) The roster reflected that nine students—six men and three women, (*see id.* at 50)—were enrolled in Plaintiff's Spring 2022 class, but this did not include the five female students who had transferred out of Plaintiff's class and into an independent student option in early April 2022. (*See id.* at 51–52; *see also id.* at 50.)

According to Plaintiff's syllabus, Philosophy 512 was intended to cover "[s]elected aspects of the political structures within which we live, such as law, rights, sovereignty, justice, liberty, [and] welfare" and that "some of the topics covered would include international law and global justice, human over-reproduction and population, human immigration (both legal and illegal), and reparations." (*See id.* at 52 (first alteration in original).) The syllabus contained the same "Content and Style Advisory" appearing in Plaintiff's Philosophy 200 syllabus. (*See id.*)

### D. Dean Casper's Reassignment of Plaintiff

On March 1, 2022, Plaintiff received two emails from Dr. Casper, who was then the Dean of the College of Arts and Letters, (*see* Compl. ¶ 15):

> Dear Professor Corlett, I'm writing to let you know that, effective immediately, I am reassigning you from your [course name]. There have been numerous student complaints and it is clear you are not effective in the course. I ask that you work with Chair Barbone, cc'ed here, to find a suitable reassignment. Please note that this reassignment will not impact your pay; you will continue to receive your full salary. Should you have any questions or concerns, I encourage you to reach out to Sasha Chizhik. Best, Monica.

(*Id.* ¶ 44; *see also* Defs.' Ex. 8 at 124; Defs.' Ex. 9 at 133, 146.) One of the emails addressed Plaintiff's Philosophy 200 course, and the other Plaintiff's Philosophy 328

course.  (*See* Defs.' Ex. 4 at 35, 71.)  Plaintiff was allowed to continue teaching Philosophy 512.  (*See id.*)

Plaintiff had no forewarning—Dean Casper sent the emails reassigning him from Philosophy 200 and Philosophy 328 without notifying him of the basis for her decision or providing him an opportunity to respond.  (*See* Compl. ¶ 45.)  Plaintiff later learned that his reassignment was the result of complaints regarding his use of the "n-word" in his Philosophy 200 course.  (*See id.* ¶¶ 51–52.)

### E.    *Student Complaints*

#### 1.    *Philosophy 200*

A then-freshman student who was half Nigerian and half White and later identified as "Student 1" in the California Department of Justice's ("DOJ") Confidential Report of Investigation, (*see* Defs.' Ex. 4 at 35, 48), complained to SDSU officials after attending sessions of Plaintiff's Philosophy 200 class on February 24, and March 1, 2022, regarding his repeated mention of the "n-word" and other racial epithets.  (*See id.* at 35.)  On April 1, 2022, Student 1 filed a formal complaint against Plaintiff alleging harassment based on race and gender as a result of his use of racial epithets and gender-related slurs.  (*See id.* at 35, 38.)

##### a.    Use of Racial Epithets

On February 24, 2022, Plaintiff began teaching a two-week unit on "Offensiphobia and the Right to Free Speech" in his Philosophy 200 course.  (*See* Defs.' Ex. 4 at 52.)  Plaintiff's "Offensiphobia" essay was part of the assigned reading.  (*See id.*)

As part of the unit, Plaintiff taught students about the "use-mention distinction," which "is a fundamental concept in analytical philosophy and was critically important to Dr. Corlett's lecture and class discussion regarding issues concerning language and racism."  (*See* Compl. ¶ 41.)  The use-mention distinction "teaches students how to analyze the linguistic and logical distinction between 'racial' and 'racist' language, i.e., that one's *use* of words entails that one believes with racist animus that the words in question apply to a particular person or group; but the mere *mention* of such words does not involve racist

intent on the part of the speaker." (*See id.* (emphasis in original).)  "[T]o make this point, one must mention the epithets in question in order to inform the class as to what does and does not constitute racist language." (*See id.*)

During the February 24, 2022 class, Plaintiff introduced the main points of his "Offensiphobia" article and presented PowerPoint slides. (*See* Defs.' Ex. 4 at 52.)  The PowerPoint slides included a list of racial epithets, including the "n-word," that he explained to the students. (*See id.*; *see also id.* at 55.)  This was the first class in which Plaintiff used the "n-word" that semester, and estimates regarding how many times he said it during that lecture varied from once to "20 times, maybe more." (*See id.* at 52–53.)  It is undisputed that Plaintiff did not direct the racial slurs at any student. (*See id.* at 54; *see also* Compl. ¶ 42.)  Opinions differed as to whether Plaintiff's mention of the "n-word" made students uncomfortable, (*see* Defs.' Ex. 4 at 54–56), but Student 1 indicated that she "felt 'super uncomfortable.'" (*See id.* at 55.)  Although she did not speak up in class that day or tell Plaintiff how she felt, she later reported that she "immediately got a sick feeling in [her] stomach" and that her "hands started sweating." (*See id.*)

Student 1 shared her experience the following day with her mentor, a graduate student identified in the Confidential Report of Investigation as Student 16. (*See id.*)  She mentioned that she "didn't know if [she] could go back to class" and "asked for advice about what [her] next steps should be." (*See id.*)

For the next class session on March 1, 2022, Student 1 attended and was accompanied by Student 17, a Black, male student and friend who was not enrolled in Philosophy 200 but had heard about Plaintiff's use of the "n-word" on February 24, 2022, and wanted to attend for "moral support." (*See id.* at 56.)  Plaintiff began the class with a summary of the "use-mention distinction" from the prior class session. (*See id.*)  Student 17 began "ask[ing] a number of questions and ma[king] assertions." (*See id.*)  Plaintiff then moved on, providing examples of Black comedians using the "n-word" and asking students whether such use was racist. (*See id.* at 57.)  Student 17 said "yes," but Plaintiff emphasized that the students would need to know the comedians' intent to know whether

their use of the word was racist.  (*See id.*)  Estimates regarding the number of time Plaintiff used the "n-word" on March 1, 2024, varied, ranging from four to "more than 50 times," (*see id.* at 57–61), and a couple students spoke up to challenge Plaintiff's use of the word during class.  (*See id.* at 57, 59, 60.)  It is undisputed, however, that Plaintiff did not direct racial slurs at any of his students.  (*See id.* at 58; *see also* Compl. ¶ 42.)

b.      Use of Gender-Related Slurs

Student 1 also complained of Plaintiff's "use[] of gender-related slurs throughout the Philosophy 200 class."  (*See* Defs.' Ex. 4 at 62.)  Students specifically reported Plaintiff's use of the words "pussy," "bitch," "rape" or "gang rape," and the "c-word."  (*See id.* at 62–63.)

Plaintiff denied using the "c-word," (*see id.* at 63), but recalled using the word "pussy" "a few times during the course of teaching Philosophy 200," although "never . . . to refer to a vagina."  (*See id.*)  Plaintiff also noted that he used the word "bitch" "as an example of what he believes is the most ambiguous word in the English language."  (*See id.*)  Finally, Plaintiff admitted to using the word "rape" as a metaphor for brainwashing, e.g., "Don't let those K-12 teachers or anybody else, your minister, or anybody else, rape your mind."  (*See id.* at 63–64.)

2.      *Philosophy 512*

On March 16, 2024, a then-junior transfer student who identifies as White and was referred to as "Student 2" in the Confidential Report of Investigation, requested to be removed from Plaintiff's Philosophy 512 class "because [Plaintiff] frequently used gender slurs and because she believed he was spending too much time lecturing about matters not related to the subject matter of the course, including discussing his removal from teaching the Philosophy 200 and Philosophy 328 classes."  (*See* Defs.' Ex. 4 at 35–36.)  On April 14, 2022, Student 2 filed a formal complaint against Plaintiff "alleging discrimination and harassment based on gender."  (*See id.* at 36, 38.)  Student 2 reported that Plaintiff "created an 'extremely toxic environment' in class" and that "the way he teaches is degrading." / / /

(*See id.* at 66.)  Because she did not want to take additional classes taught by Plaintiff, it was "difficult for [her] to register for classes . . . [she] need[ed] for [her] major." (*See id.*)

Although no other students filed formal complaints against Plaintiff, a student identified in the Confidential Report of Investigation as "Student 3" emailed Dean Casper on March 11, 2022, regarding Plaintiff's "consistent[] . . . comments about sexual assault, critici[sm of] the MeToo movement and the handling of the Bill Cosby rape cases, continuous[] . . . comments for the sake of shock value, and . . . spending class time talking about how he should respond to being removed from teaching his other Philosophy classes." (*See id.* at 36, 40; *see also id.* at 68.)

### a.  Use of Gender-Related Slurs

Several students recalled Plaintiff using the word "pussy" throughout Philosophy 512, generally "to refer to people or groups as weak or not assertive." (*See* Defs.' Ex. 4 at 66; *see also id.* at 65, 67–70.)  For example, one student recalled Plaintiff saying that anyone who retires is a "pussy." (*See id.* at 65.)  Although Plaintiff admitted to using the word "pussy" in Philosophy 200, he denied having used it in Philosophy 512.  (*See id.* at 71.)

Several students also recalled Plaintiff using the word "rape" as a "metaphor," such as "schools are constantly raping our minds." (*See id.* at 65, 67, 68.)  Plaintiff denied using the word rape in such a context in Philosophy 512 but admitted to using it in that fashion in Philosophy 200.  (*See id.* at 71.)  Plaintiff contended he "used the word 'rape' in Philosophy 512 only in the context of discussing appropriate punishment for someone like Adolph Hitler." (*See id.*)  Two female students noted that Plaintiff "discussed rape in a way that made them feel uncomfortable, criticizing the MeToo movement and stating that women lied about rape." (*See id.* at 67; *see also id.* at 67–68.)  Plaintiff admits that "he criticized the MeToo movement in class, alleging that movement leaders 'think the lack of due process, the wrongful conviction of an innocent person, is a small price to pay for catching a larger group of such people who are guilty of sexual assault.'" (*See id.* at 71.)

/ / /

Although Student 2 accused Plaintiff of using the "c-word" in class "constantly," (*see id.* at 65), no other students recalled him doing so. (*See id.* at 66–67, 69, 71.)  Similarly, although Student 2 reported that Plaintiff "favored" the male students in Philosophy 512, (*see id.* at 65), none of the other students believed that Plaintiff had "treated men and women students differently." (*See id.* at 67.)

b.      Reassignment from Philosophy 200

It is undisputed that Plaintiff "discussed the Philosophy 200 controversy with his Philosophy 512 class." (*See* Defs.' Ex. 4 at 71.)  Plaintiff explained that "[he] wanted to give them a real life example of how many people in their generation or beyond don't seem to understand the importance of free speech and academic freedom, and how important it is to a reasonably just society." (*See id.*)  He also "asked the students for advice about how to respond to the controversy." (*See id.*)

Although Plaintiff claimed that he did not have an attorney at that time, (*see id.*), one student said he mentioned "lawyering up," (*see id.* at 72), and another recalled him saying that he had been "waiting for a reason to sue the school" and "was glad it happened because it gave him a reason." (*See id.* at 73.)  Another student recalled Plaintiff saying that, "because of tenure, [he]'d have to rape or murder someone for [SDSU] to remove [him]" from his position. (*See id.* at 72.)

c.      Fallout

On March 10, 2022, Dr. Casper and SDSU's in-house counsel met with Plaintiff and his attorney to advise Plaintiff that an outside community organization that may or may not have included students was planning to stage a protest at his Philosophy 512 class. (*See* Compl. ¶ 55.)  Dr. Casper intended to allow the protestors access to the building in which his class was being held and the classroom itself. (*See id.*)  Plaintiff suggested to his students over Google Chat the possibility of temporarily moving the class online "for [their] safety." (*See* Defs.' Ex. 4 at 74.)  A couple of people from Student Affairs sat in on Plaintiff's Philosophy 512 class on March 10, 2022, but nobody disrupted the class that day. (*See id.*)

20

Plaintiff's Philosophy 512 students continued to discuss safety concerns the following day over a group chat. (*See id.*) Student 3 encouraged students to contact Dean Casper with any concerns regarding continuing the class in person or going online. (*See id.* at 75.) She added that the college was considering setting up an independent study program for those who were "uncomfortable continuing in Prof. Corlett's Philosophy 512 class." (*See id.*) Ultimately, five women withdrew from Plaintiff's Philosophy 512 class in favor of the independent study option with Dr. Barbone. (*See id.* at 36, 50.)

### F.   Grievance Process

#### 1.   Plaintiff's Grievance

On April 11, 2022, Plaintiff submitted a Grievance Form Unit 3 regarding his reassignment from Philosophy 200 and 328. (*See* Compl. ¶ 66; *see also generally* Defs.' Ex. 7.) Plaintiff generally alleged that his "First Amendment rights to free speech and academic freedom as well as [his] Fourteenth Amendment right to due process were violated by Dean Casper through emails dated March 1, 2022." (*See* Defs.' Ex. 7 at 121.) He sought "immediate reinstatement to the courses from which [he had been] removed" and "public acknowledgement by SDSU that [his] mention of the language that caused [his] removal from the course was protected speech under the First Amendment and under basic principles of academic freedom." (*See id.*)

#### 2.   Dr. Tong's Level I Denial

Dr. Tong was designated to hear the grievance. (*See* Compl. ¶ 67.) Plaintiff and his counsel met with Dr. Tong for a Level I meeting on May 18, 2022. (*See id.*) Dr. Tong issued a Level I Response denying Plaintiff's grievance on July 25, 2022. (*See id.* ¶ 68; *see also, generally* Defs.' Ex. 8.) Although the letter was seven pages long, the bulk of it incorporated wholesale Plaintiff's grievance, Dr. Casper's emails, and the various relevant policies. (*See* Defs.' Ex. 8 at 123–28.)

Regarding Plaintiff's First Amendment challenge, Dr. Tong noted only that the SDSU Senate Policy file "indicates that academic freedom comes with responsibilities, including respect for others[,]" and that "[r]easonable regulations may be designed to avoid

disruption of the mission of the university, particularly academic instruction, research and creative activity." (*See id.* at 128.)  There was no discussion of the speech at issue, (*see generally id.* at 124, 128–29), or analysis as to whether it was protected under the First Amendment.  (*See id.* at 128–29.)

As for Plaintiff's due process challenge, Dr. Tong noted that Provisions 20.2a and b of the Collective Bargaining Agreement ("CBA") provided that the appropriate administrator—here, Dean Casper—had the right to determine instructional assignments after consultation with the department chair and/or the relevant faculty member.  (*See id.* at 129.)  Dr. Tong concluded that there was no violation of Plaintiff's due process rights because Dean Casper had met with Dr. Barbone, the Chair of the Department of Philosophy, before sending the emails and because the reassignment did not impact Plaintiff's pay, meaning he was not deprived of life, liberty, or property.  (*See id.*)

### 3.   *Plaintiff's Appeal*

On August 8, 2022, Plaintiff, through his counsel in this action, appealed Dr. Tong's decision.  (*See* Compl. ¶ 73; *see also generally* Defs.' Ex. 9.)  SDSU held a hearing before a Faculty Hearing Committee ("FHC") on January 31, 2023.  (*See* Compl. ¶ 74.)

Plaintiff called three witnesses: (1) Dorette Ponce, a female SDSU graduate student in Philosophy who had taken multiple courses with him; (2) Akacia Brillon, an African-American female student enrolled in a Ph.D. program in Philosophy at UCLA who had taken multiple courses with Plaintiff when she had been an undergraduate; and (3) Howard McGary, Ph.D., "an African[-]American scholar in the area of racism and philosophy holding the position of Distinguished Emeritus Professor in the Department of Philosophy at Rutgers University."  (*See id.* ¶ 75.)  He also introduced into evidence a letter from Dr. Nathan Salmon, Distinguished Professor, Department of Philosophy, University of California, Santa Barbara.  (*See id.* ¶ 76; *see also generally* Pl.'s Ex. 2.)

### 4.   *Faculty Hearing Committee's Denial*

Following the hearing, the FHC voted unanimously to deny Plaintiff's grievance. (*See generally* Defs.' Ex. 10; *see also id.* at 167; Compl. ¶ 80.)  Like Dr. Tong, the FHC

concluded that Dean Casper had "consulted with all necessary parties in accordance with CFA/CSU Bargaining Agreement 20.2(b)." (*See* Defs.' Ex. 10 at 167.)  The FHC also determined that Dean Casper's "action to reassign Professor Corlett from his Philosophy 328 and Philosophy 200 courses [was] in alignment with SDSU's policy," (*see id.* at 168), because emails from Plaintiff's students "evidenced . . . that many students' needs were not being met through his instruction." (*See id.*)  Finally, "the FHC conclude[d] that Corlett's mention of the 'n-word' was not the single driving cause of his reassignment; his reassignment was the outcome of a pattern of actions on behalf of Professor Corlett." (*See id.* at 169.)

### G.     *Title IX Investigation*

On April 15, 2022, Plaintiff received a Notice of Investigation from Gail Mendez, SDSU's Director, Center for Prevention of Harassment and Discrimination and Title IX Coordinator, informing him that SDSU was investigating complaints from two students that he had "engaged in Harassment based on Race and/or Gender" in the Spring 2022 semester and "whether the allegations constitute unprofessional conduct under Education Code Section 89535." (*See* Compl. ¶ 81.)  One of the complaints was from Student 1 regarding Plaintiff's use of racial epithets and gender-related slurs in Philosophy 200, *see supra* Section II.E.1; (*see also* Compl. ¶¶ 82–83), and the other was from Student 2 regarding Plaintiff's use of gender slurs in Philosophy 512.  *See supra* Section II.E.2; (*see also* Compl. ¶ 83).

#### 1.     *The Investigative Process*

SDSU retained the California DOJ to investigate the complaints, (*see* Compl. ¶ 85), which assigned Supervising Deputy Attorney General Jodi Cleesattle was assigned.  (*See* Defs.' Ex. 4 at 36.)  As part of her investigation, Ms. Cleesattle interviewed the two complainants, Student 1 and Student 2; Plaintiff; two students from Plaintiff's Spring 2022 Philosophy 200 class; seven students from Plaintiff's Spring 2022 Philosophy 512 class; and Robert Francescotti, Ph.D., a Professor and Undergraduate Advisor in SDSU's Philosophy Department.  (*See* Defs.' Ex. 4 at 36–38)  Ms. Cleesattle also reviewed a large

number of documents, including, among other materials, the relevant underlying policies and provisions from the California Education Code; Student 1's and Student 2's complaints; class rosters and syllabi from Plaintiff's Spring 2022 Philosophy 200 and 512 classes; various group chats related to Plaintiff's Spring 2022 Philosophy 200 and 512 classes; various emails from students to SDSU faculty regarding Plaintiff; various letters written in support of Plaintiff; various news articles and opinion pieces; Plaintiff's "Offensiphobia" article; and Plaintiff's student evaluations and online ratings.  (*See id.* at 38–43.)

Ms. Cleesattle issued a 42-page preliminary report on November 14, 2022.  (*See* Defs.' Ex. 4 at 36.)  Plaintiff responded on December 5, 2022, providing a letter as well as two March 2021 periodic reviews from his Philosophy colleagues.  (*See id.*)

### 2. The Investigative Report

Ms. Cleesattle issued her 59-page final Confidential Report of Investigation on December 15, 2022 (the "Report").  (*See* Compl. ¶ 95; *see also generally* Defs.' Ex. 4.) The Report included Ms. Cleesattle's findings of relevant facts, (*see* Defs.' Ex. 4 at 76–81), and conclusions on the merits as to whether Plaintiff's conduct violated any university policies or constituted "unprofessional conduct" under California Education Code § 89535(b).

#### a. Factual Findings

Ms. Cleesattle made the following pertinent factual findings based on the preponderance of the evidence:

(1)    Plaintiff said the "n-word" approximately 10 to 20 times during the March 1, 2022 session of Philosophy 200 and fewer times during the February 24, 2022 class session, (*see* Defs.' Ex. 4 at 78);

(2)    Plaintiff's use of the "n-word" and other racial slurs was in the context of him teaching about racial slurs, (*see id.*);

/ / /

/ / /

(3)     Plaintiff's repetition of the "n-word" "made some students uncomfortable and upset, and . . . he continued to repeat the word after students expressed their discomfort," (*see id.*);

(4)     Plaintiff "used the words 'pussy' and 'bitch' in his Philosophy 200 and Philosophy 512 classes, not in an academic context, but as a derogatory slur," (*see id.*);

(5)     Plaintiff did not use the "c-word," (*see id.* at 80);

(6)     Plaintiff "used the word 'rape' in academic contexts and non-academic contexts in both [his] Philosophy 200 and Philosophy 512 classes," including "as a graphic metaphor to criticize the education system and other institutions on one or more occasions," (*see id.* at 81); and

(7)     Plaintiff did not "treat[] female students in Philosophy 512 differently or worse than . . . male students."  (*See id.*)

> b.     Findings on the Merits

As for the merits, Ms. Cleesattle concluded that Plaintiff did not engage in discrimination based on gender, (*see id.* at 81–82), or harassment based on race, (*see id.* at 84–87), or sexual harassment in violation of the CSU Nondiscrimination Policy.  (*See id.* at 88–89.)  Ms. Cleesattle did note, however, that Plaintiff's use of the "n-word" likely qualified as "harassment" because his repetition of the word was intimidating to Black students and created a hostile learning environment, (*see id.* at 86), but that it failed to meet the "because of" nexus to the complainant's protected status given that he did not use the "n-word" in a derogatory manner but instead in the context of teaching the use-mention distinction.  (*See id.* at 86–87.)

Ms. Cleesattle also found that Plaintiff did not engage in "unprofessional conduct" under California Education Code section 89535(b), although it was "a close question." (*See* Defs.' Ex. 4 at 89–90.)  She noted that Plaintiff's conduct "displayed a lack of professionalism" and "displayed a failure to treat his students with a baseline level of sensitivity and a disregard for the impact of his conduct on his students' wellbeing and ability to fully participate in his classes."  (*See id.* at 90.)  Given "uncertain[ty]" regarding

the definition of the term "unprofessional conduct," however, Ms. Cleesattle concluded that it was not clear whether Plaintiff's conduct rose to that level.  (*See id.*)

Finally, Ms. Cleesattle concluded that Plaintiff did engage in harassment based on gender in violation of the Nondiscrimination Policy, (*see id.* at 82–84), and that his conduct in that regard was not protected by academic freedom because his "frequent use of the word 'pussy' in his Philosophy classes . . . was not . . . in an academic context, nor was it relevant to the concepts he was teaching." (*See id.* at 87.)  Specifically, Ms. Cleesattle concluded that Plaintiff's repeated use of the word "pussy" constituted "unwelcome verbal . . . conduct engaged in because of an individual Complainant's Protected Status" because

> his use of the word to express derision to others was based on its connection to the female gender.  Prof. Corlett used the word "pussy" in a way that is insulting and demeaning toward women in general because it assigns derogatory meaning to a slang word that is used to reference a woman's vagina.  The use of the word "pussy" to denote weakness or lack of courage associates these negative qualities with women in a derogatory manner.  Thus, Prof. Corlett's use of the word "pussy" to describe people or groups he viewed as weak or cowardly was linked specifically to the word's association with these supposedly negative female qualities.

(*See id.* at 83; *see also id.* at 82–84.)  Further, Plaintiff's use of the work "pussy" fell within both meanings of "harassment" set forth in Article VII.A.2 of the Nondiscrimination Policy because Student 2 "was effectively compelled to submit to Prof. Corlett's verbal conduct in order to participate in his class and obtain academic credit, within the meaning of Article VII.A.2.a" and "Prof. Corlett's conduct was sufficiently severe or pervasive that its effect could be considered by reasonable female students to create an intimidating and hostile learning environment, within the meaning of Article VII.A.2.b" and Student 2 "did, in fact, consider the learning environment . . . sufficiently hostile that she transferred into an independent study option, as did four other female students." (*See id.* at 84.)

### c.    Further Considerations

Ms. Cleesattle was careful to note that her conclusions did "not mean that Prof. Corlett's conduct was appropriate." (*See* Defs.' Ex. 4 at 91.)  "Rather, it showed egregious

disregard for the reasonable concerns of his students," prompting her to identify "management issues that SDSU may wish to address." (*See id.*)

First, Ms. Cleesattle recommended that "SDSU may wish to review its policies regarding professionalism and classroom decorum." (*See id.*) She suggested, for example, that SDSU update its policies "to require that faculty and students treat each other with respect and avoid behavior and language that reasonably could create a hostile and intimidating learning environment." (*See id.*)

She also proposed that "SDSU's deans and department chairs may wish to provide greater oversight of faculty course curricula." (*See id.*) "Where appropriate, SDSU should consider exercising oversight when professors seek to insert material unrelated to the subject of a course, especially where, as here, it would reasonably be considered offensive by students who are taking the course to fulfill general education requirements." (*See id.* at 92.)

### 3.    Adoption and Appeal

SDSU's Title IX office issued a Notice of Investigation Outcome adopting the Ms. Cleesattle's findings in the Report on January 24, 2023. (*See* Compl. ¶ 116.) On February 7, 2023, Plaintiff filed an appeal with CSU's Office of the Chancellor. (*See id.* ¶ 117.) Plaintiff contended that "[t]here was no reasonable basis for" the finding that he engaged in sexual harassment because the epithets in question were not made "because of" and were not "substantially motivated by" the Complainant's gender-based protected status and because his references to epithets were pedagogically relevant to his teaching and was therefore protected speech. (*See id.* ¶ 118.)

On June 20, 2023, the Office of the Chancellor rejected Plaintiff's appeal. (*See id.* ¶ 119.) Specifically, the Office of the Chancellor "adopted the DOJ Report's findings and concluded that because a meaning of the word 'pussy' and a meaning of the word 'bitch' can have a 'connection to the female gender,' that alone suffice[d] as 'substantial evidence' that Dr. Corlett's 'use of the term was substantially motivated by Complainants' gender." (*See id.* ¶ 125.) The Office of the Chancellor also found that there was sufficient evidence

that Plaintiff's use of the "gender slurs" was not relevant to the course content.  (*See id.* ¶ 126.)  The Office of the Chancellor concluded that the matter was "closed."  (*See id.* ¶ 129.)

### H.  *Disciplinary Action*

#### 1.  *Dr. Tong's Notice of Pending Disciplinary Action*

On August 23, 2023, Dr. Tong issued a Notice of Pending Disciplinary Action to Plaintiff.  (*See* Compl. ¶ 131; *see also generally* Defs.' Ex. 6.)  The Notice indicated that the pending discipline was "a one-semester suspension without pay from [Plaintiff's] position as Professor in the Department of Philosophy" "for unprofessional conduct and/or failure or refusal to perform the normal and reasonable duties of [Plaintiff's] position, as these terms are used in subdivisions (b) and (f), respectively, of California Education Code section 89535." (*See* Defs.' Ex. 6 at 107.)  Specifically, the Notice concluded that Plaintiff had

> failed to perform the normal and reasonable duties of [his] faculty position, Professor in the Department of Philosophy, and engaged in unprofessional conduct when [he] engaged in harassment based on gender in violation of the *CSU Nondiscrimination Policy* and SDSU University Senate Policy by using gender slurs, including "pussy" and "bitch," in a derogatory manner while teaching Philosophy 512 (Political Philosophy) in the Spring 2022 semester.

(*See id.* at 112 (emphasis in original).)

Based on the Report, Dr. Tong concluded that Plaintiff had violated the Nondiscrimination Policy by engaging in harassment based on gender.  (*See id.* at 112–14; *see also* Compl. ¶ 132(1).)  Because Plaintiff had violated the Nondiscrimination Policy, Dr. Tong concluded that Plaintiff also had violated Senate Policies requiring him to "maintain an atmosphere conducive to learning" and to "maintain and promote a policy of nondiscrimination on the basis of . . . gender identity and expression."  (*See* Defs.' Ex. 6 at 114; *see also* Compl. ¶ 132(2).)  Finally, Dr. Tong concluded that Plaintiff's violation of the Nondiscrimination Policy and Senate Policies amounted to "failure or refusal to perform the normal and reasonable duties of [his] position as Professor in the Philosophy

Department in violation of California Education Code Section 89535(f)" and "unprofessional conduct as set forth in California Education Code Section 89535(b)," either of which, "standing alone, [wa]s sufficient to warrant th[e] one-semester suspension without pay." (*See* Defs.' Ex. 6 at 115; *see also* Compl. ¶ 132(3).)

### 2.    Plaintiff's Appeal

On September 17, 2023, Plaintiff sought administrative review through the Office of the Provost's Reviewing Officer, Casie Martinez. (*See* Compl. ¶ 133.) Plaintiff contended that he had not engaged in harassment based on gender under the plain language of the Nondiscrimination Policy, that Dr. Tong had failed to apply the appropriate standard to Plaintiff's speech, and that Plaintiff's speech was protected under the First Amendment. (*See id.*)

On September 23, 2023, Ms. Martinez recommended that Dr. Tong reject Plaintiff's administrative review. (*See id.* ¶ 134.) On September 26, 2023, Dr. Tong issued his Final Decision Regarding Pending Disciplinary Action affirming the one-semester suspension without pay as of January 16, 2024. (*See id.* ¶ 135.)

### I.    *External Review of the Philosophy Department*

In Fall 2023, an External Review was conducted of SDSU's Department of Philosophy. (*See* Compl. ¶ 147.) The external reviewers were a Professor from San Francisco State University's Department of Philosophy, an Associate Professor from SDSU's Department of Physics, and a Professor of Philosophy and Acting Chair of the Department of English from CSU-Northridge. (*See* Defs.' Ex. 5 at 105; *see also* Compl. ¶ 148.) They "were asked to assess the climate in the Philosophy Department and to make whatever recommendations [they] could, at the end of a two-day review, for improving the climate in a way that w[ould] encourage the retention of new faculty." (*See* Defs.' Ex. 5 at 95; *see also* Compl. ¶ 147.)

The reviewers submitted their External Reviewers' Report on November 13, 2023. (*See generally* Defs.' Ex. 5; *see also* Compl. ¶ 150.) In response to the Department's concerns regarding "the dwindling number of [tenured or tenure-track] faculty and a

difficult climate," the Report observed that "[t]he Department's climate woes seem rooted primarily—perhaps only—in the relationship among tenure faculty in the Department and in how the dynamics of that challenging relationship contribute to the existence of an inhospitable atmosphere for new tenure-track faculty." (*See* Defs.' Ex. 5 at 96 (first alteration in original).)  The "considered opinion of the review team, generated organically over the course of its visit with the Department and solidified, in fact, in its meeting with Professor Corlett himself" was "that this cycle of hostility and intimidation [wa]s being perpetuated by one member of the Department, Professor Angelo Corlett."  (*See id.*; *see also* Compl. ¶ 151.)  The reviewers' "primary recommendations" were:

> everyone at SDSU who is concerned with the well-being of its Philosophy Department, including both the Department itself and administration at every level, must do all they can
>
> 1.   to break the cycle of hostility and intimidation that is being perpetuated by Professor Corlett, and
>
> 2.   to ease tensions among the permanent faculty in the Department, tensions that exist in part over disagreements concerning whether academic freedom licenses certain kinds of conduct in the classroom and disagreements over the nature of philosophy and over whether work in certain marginalized areas counts as philosophy.

(*See id.* at 98 (emphasis omitted).)  With regard to the first recommendation, the reviewers further recommended both that "qualified faculty in the Department continued serving in important departmental advising and mentoring roles" and that

> an Acting Chair of Philosophy be appointed as soon as it is possible to do that, someone who has the capacity to help break the cycle of hostility and intimidation that now exists in the Department, who will not feel as though they must endure hostility and intimidation in order to preserve a strained sense of collegiality, or in order to ensure that the Department is able to continue to serve its students, or in order to avoid certain negative repercussions.

(*See id.* (emphasis omitted).)  As to the second recommendation, the reviewers reiterated their recommendation that "an Acting Chair of Philosophy be appointed as soon as it is possible to do that, someone who has the capacity to help ease tensions among the

permanent faculty in the Department." (*See id.* at 99 (emphasis omitted).)  They further recommended that, "once an Acting Chair has taken steps to break the cycle of hostility and intimidation and to ease the tensions described above among the permanent faculty in the Department, the Department be allowed to hire . . . at least three tenure-track hires in the next five years . . . , beginning with hires in comparative philosophy, continental thought, and Asian or Islamic thought." (*See id.* at 100 (emphasis omitted).)

## III.   Relevant Procedural Background

Plaintiff instituted this action on January 11, 2024, filing his Complaint for Injunctive and Declaratory Relief and Damages against Defendants in their individual and official capacities and alleging four causes of action for (1) retaliation in violation of Plaintiff's First and Fourteenth Amendment rights against both Drs. Tong and Casper, (2) retaliation based on viewpoint in violation of Plaintiff's First and Fourteenth Amendment rights against both Drs. Tong and Casper, (3) violation of Plaintiff's substantive due process rights under the Fourteenth Amendment against Dr. Tong only, and (4) a declaration that both Drs. Tong and Casper violated CSU's "Freedom of Expression" and "Academic Freedom" Senate Policies.  (*See generally* ECF No. 1.)  On January 23, 2024, Plaintiff filed proof of substituted service on Drs. Tong and Casper at SDSU's Office of the Provost and Department of Sociology, respectively, as of January 12, 2024, pursuant to California Code of Civil Procedure § 415.20.  (*See generally* ECF Nos. 3 (Dr. Tong), 4 (Dr. Casper).)

Defendants answered Plaintiff's Complaint on February 27, 2024, asserting the following affirmative defenses: (1) failure to state a claim, (2) insufficient service on Defendants in the official capacities under Federal Rule of Civil Procedure 5(i), (3) Eleventh Amendment immunity, (4) qualified immunity, and (5) reservation of defenses.  (*See generally* ECF No. 8.)  Thereafter, the Parties appeared for an Early Neutral Evaluation Conference and Case Management Conference before the Honorable Michelle M. Petit on May 24, 2024, (*see generally* ECF No. 13), following which Magistrate Judge Petit issued the Scheduling Order Regulating Discovery and Other Pretrial Proceedings.

(*See generally* ECF No. 14.)  The instant Motion followed that same day.  (*See generally* ECF No. 15.)

On August 6, 2024, Plaintiff filed additional proofs of substituted service as to Defendants at CSU's Office of General Counsel as of June 26, 2024, pursuant to California Code of Civil Procedure § 416.90.  (*See generally* ECF Nos. 21 (Dr. Tong), 22 (Dr. Casper).)

## LEGAL STANDARD

A party may file a motion for judgment on the pleadings after that party files an answer.  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings pursuant to Rule 12(c) is functionally identical to a Rule 12(b)(6) motion and "the same standard of review applies to motions brought under either rule."  *Gregg v. Haw. Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (quotation omitted).  The Court must accept all factual allegations as true, draw reasonable inferences in favor of the non-moving party, and decide whether the allegations "plausibly suggest an entitlement to relief."  *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)).  The Court may disregard, however, all factually unsupported claims framed as legal conclusions and recitations of the legal elements of a claim.  *See Iqbal*, 556 U.S. at 681.  "Finally, although Rule 12(c) does not mention leave to amend, courts have discretion both to grant a Rule 12(c) motion with leave to amend, and to simply grant dismissal of the action instead of entry of judgment."  *Lonberg v. City of Riverside*, 300 F. Supp. 2d 942, 945 (C.D. Cal. 2004) (citing *Carmen v. San Francisco Unified Sch. Dist.*, 982 F. Supp. 1396, 1401 (N.D. Cal. 1997); *Moran v. Peralta Cmty. Coll. Dist.*, 825 F. Supp. 891, 893 (N.D. Cal. 1993)).

## ANALYSIS

Through the instant Motion, Defendants seek judgment on the pleadings in their favor on several grounds:

1.    Plaintiff fails to plausibly allege First Amendment retaliation because gratuitous profanity did not raise a matter of public concern and is not protected speech.

2.      Plaintiff fails to plausibly allege viewpoint discrimination because he was not engaged in protected activity and cannot identify any CSU rule that discriminates based on viewpoint.

3.      Plaintiff fails to plausibly allege any violation of due process where his substantive due process claim is preempted, he fails to allege a deprivation of a constitutional liberty, and CSU's Non-Discrimination Policy is not vague.

4.      Plaintiff's request for declaratory relief fails to allege a violation of any legal right.

5.      Plaintiff did not properly serve Defendants in their official capacities.

6.      Sovereign immunity bars Plaintiff's claims on Defendants, in their official capacities.

7.      Defendant Casper was improperly named as a Defendant.

8.      Qualified immunity bars Plaintiff's claims for damages against defendants in their individual capacities.

(Mot. at 1–2; *see also generally* ECF No. 15-1 ("Mem.").)

## I.    Procedural Challenges

In addition to contesting the sufficiency of Plaintiff's allegations, Defendants raise several "procedural defects." (*See* Mem. 22–24; Reply at 9–10.) Because at least one of these arguments is jurisdictional, the Court begins with Defendants' procedural challenges before reaching their arguments on the merits. *See Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012) ("[Ninth Circuit] precedent dictates that [the court] resolve an Eleventh Amendment immunity claim before reaching the merits.").

### A.    Official Capacity Claims

Defendants contend that Plaintiff's causes of action against Defendants in their official capacities must be dismissed because (1) Plaintiff failed to establish good cause for

/ / /

/ / /

/ / /

his untimely service of process,[10] (*see* Mem. at 22–23; Reply at 9); (2) the claims are barred by sovereign immunity, (*see* Mem. at 23–24; Reply at 9–10); and (3) Dr. Casper is improperly named because she no longer holds the office of Dean of the College of Arts and Letters, (*see* Mem. at 24; Reply at 10).

### 1.   Service of Process

It is undisputed that Plaintiff did not timely serve Defendants in their official capacities.  (*See* Opp'n at 22; Willner Decl. ¶ 6; *see also* Reply at 9.)  The question, therefore, is whether Plaintiff can establish excusable neglect under Federal Rule of Civil Procedure 6(b)(1)(B).

"Excusable neglect 'encompass[es] situations in which the failure to comply with a filing deadline is attributable to negligence,' and includes 'omissions caused by carelessness.'"  *Lemoge v. United States*, 587 F.3d 1188, 1192 (9th Cir. 2009) (alteration in original) (first quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 388 (1993); then quoting *id.* at 394).  "The determination of whether neglect is excusable 'is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission.'"  *Id.* (quoting *Pioneer*, 507 U.S. at 395).  "To determine when neglect is excusable, [the court] conduct[s] the equitable analysis specified in *Pioneer* by examining 'at least four factors: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith.'"  *Id.* (quoting *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223–24 (9th Cir. 2000)).

The Parties do not dispute that Defendants alerted Plaintiff's counsel to his failure properly to serve them in their official capacities "[n]ot long after this action was

---

[10]   A defendant waives a Rule 12(b)(5) defense for insufficient service of process if it is not waived in their responsive pleading.  *See* Fed. R. Civ. P. 12(h)(1).  Here, Defendants included "insufficient service" under "Rule 5(i)" in their Answer as their second affirmative defense.  (*See* Ans. at 20.)  Although the Court is unaware of any Rule 5(i), the Court concludes that Defendants preserved their challenge to Plaintiff's service of process.

commenced in January 2024." (*See* Willner Decl. ¶ 6; *see also* Defs.' Ex. F at 12–13 (email communication dated January 26, 2024).) Plaintiff's counsel explains that, in early March 2024, he picked up an administrative trial that did not conclude until the end of May. (*See* Willner Decl. ¶ 6.) He "either thought that [he] had ultimately made proper service or simply forgot that the issue was left hanging" and "did not realize that the issue was still unresolved until [he] read Defendants' Motion." (*See id.*) Thereafter, Plaintiff's counsel properly—but untimely—served Defendants in their official capacities on June 26, 2024. (*See id.*; *see also* ECF Nos. 21, 22.)

Although Plaintiff's counsel could have been more diligent in effecting service of process on Defendants in their official capacities, there is no evidence that he failed to act in good faith. Further, because Defendants had already been served in their individual capacities, there has been no delay in these proceedings. Indeed, Defendants fail to identify any prejudice that would inure to their detriment. (*See generally* Mem. at 22–23; Reply at 9.) Under these circumstances, Defendants ask the Court to elevate form over function. The Court declines to do so and therefore **DENIES IN PART** Defendants' Motion to the extent it seeks dismissal of Plaintiff's causes of action against them in their official capacities pursuant to Federal Rule of Civil Procedure 4(m).

*2.    Sovereign Immunity*

Defendants also contend that Plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment, (*see* Mem. at 23–24; Reply at 9–10), which "provides: 'The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.'" *See Crowe v. Ore. State Bar*, No. 23-35193, ___ F.4th ___, 2024 WL 3959335, at *15 (9th Cir. Aug. 28, 2024) (quoting U.S. Const. amend. XI). "The [Supreme] Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court," *see Kentucky v. Graham*, 473 U.S. 159, 169 (1985), as well as "certain actions against state agents and state instrumentalities." *See Regents of*

*the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997). "This bar remains in effect when State officials are sued for damages in their official capacity." *Graham*, 473 U.S. at 169.

"SDSU is an 'instrumentalit[y] of the state' protected by Eleventh Amendment immunity, as are its employees when acting in their official capacities." *See Marin v. Catano*, No. 21CV1445-JO-MDD, 2023 WL 2958467, at \*3 (S.D. Cal. Apr. 14, 2023) (first citing *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982); then citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984)). Consequently, and as Plaintiff conceded at oral argument, (*see* ECF No. 23), to the extent Plaintiff seeks monetary relief from Defendants in their official capacities, (*see* Compl. Prayer ¶¶ 3–5), the Court necessarily **GRANTS IN PART** Defendants' Motion. *See Jackson*, 682 F.2d at 1350–51.

"[U]nder *Ex Parte Young* and its progeny, a suit seeking prospective equitable relief against a state official [sued in her official capacity] who has engaged in a continuing violation of federal law is not deemed to be a suit against the [s]tate for purposes of state sovereign immunity." *See Crowe*, 2024 WL 3959335, at \*21–22 (alterations in original) (quoting *In re Ellett*, 254 F.3d 1135, 1138 (9th Cir. 2001) (citing *Ex Parte Young*, 209 U.S. 123, 159–60 (1908))). As Plaintiff also conceded at oral argument, (*see* ECF No. 23), he does not seek any prospective declaratory relief, (*see* Compl. Prayer ¶ 1), and Defendants contend that Plaintiff does not seek prospective injunctive relief here such that *Ex Parte Young* applies.[11] (*See* Mem. at 24.) Because Plaintiff fails to address Defendants' arguments regarding prospective injunctive relief under *Ex Parte Young*, (*see generally* Opp'n), the Court also **GRANTS IN PART** Defendants' Motion as to Plaintiff's claims for declaratory and injunctive relief against Defendants in their official capacities.

---

[11] Defendants also contended for the first time in their Reply that, to the extent Plaintiff seek "[a] preliminary injunction requiring Defendant Tong to vacate his suspension of Plaintiff without pay for one semester[ and] restoring him to his teaching position along with his full pay and benefits," (*see* Compl. Prayer ¶ 2), that request is now moot. (*See* Reply at 10.) To the extent this is an attack on Plaintiff's standing, however, "[s]tanding is assessed when the complaint is filed." *Gilley v. Stabin*, No. 23-35097, ___ F. App'x ___, 2024 WL 1007480, at \*1 (9th Cir. Mar. 8, 2024)).

### 3.    Dr. Casper

Finally, Defendants contend that Plaintiff's claims against Dr. Casper in her official capacity must be dismissed because, as Plaintiff himself acknowledges, (*see* Compl. ¶ 15), she no longer holds the position of Dean of the College of Arts and Letters.  (*See* Mem. at 24; Reply at 10.)  The Court has already determined that the claims against Dr. Casper in her official capacity are subject to dismissal, *see supra* Section I.A.2, and Plaintiff conceded at oral argument that Dr. Casper was subject to dismissal in her official capacity.  (*See* ECF No. 23.)  Accordingly, the Court **GRANTS IN PART** Defendants' Motion and **DISMISSES** Plaintiff's claims against Dr. Casper in her official capacity on the additional and independent ground that she is no longer the proper defendant.  *See, e.g.*, *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 732 n.15 (9th Cir. 2022).

### B.    Individual Capacity Claims

Finally, Defendants contend that Plaintiff's claims for damages against them in their individual capacities are barred by qualified immunity.  (*See* Mem. at 24–25; Reply at 10.)  "Qualified immunity protects government officials acting in good faith and under the color of state law from suit under § 1983."  *Cates v. Stroud*, 976 F.3d 972, 978 (9th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "Qualified immunity bars suits against government officials when either (1) no deprivation of constitutional rights was alleged or (2) the law dictating that specific constitutional right was not yet clearly established."  *Id.* (citing *Pearson*, 555 U.S. at 236).  "Court may begin with either prong of the analysis."  *Id.* (citing *Pearson*, 555 U.S. at 236).  Accordingly, "Defendants are entitled to qualified immunity, even if they violated [Plaintiff]'s First Amendment rights, if they reasonably could have believed that their conduct was lawful 'in light of clearly established law and the information [that they] possessed.'"  *See Demers v. Austin*, 746 F.3d 402, 417 (9th Cir. 2014) (second alteration in original) (quoting *Cohen v. San Bernardino Valley Coll.*, 92 F.3d 968, 973 (9th Cir. 1996)).  "A right is clearly established when the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Id.* (internal quotation marks

omitted) (quoting *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1073 (9th Cir. 2012)). The inquiry does not "require a case directly on point," *see Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), but must give the defendants "fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Defendants contend that "the underlying constitutional requirements were not so clearly established that all officials would understand, beyond debate, that removing Plaintiff from his class and suspending his employment would violate the Constitution." (*See* Mem. at 25.)  This is because "[n]o prior case teaches that professions have a constitutional right to repeat the word 'n*****' in class, over student objections[, a]nd no prior case teaches that a university must look the other way when a professor gratuitously uses gender slurs." (*See id.*)  Plaintiff responds that "'clearly established' does not require precedent with identical facts" and that "[t]he Ninth Circuit's ruling in *Demers*, which was decided at least nine years before Defendants disciplined Dr. Corlett, provided exactly the 'fair warning' to Defendants that disciplining him for his use of pedagogically relevant classroom speech would constitute First Amendment retaliation." (*See* Opp'n at 20–21.) Defendants respond that *Demers* defines the relevant law at too high a level of generality and "did not even involve classroom speech or students." (*See* Reply at 10.)

In *Demers*, the plaintiff was a tenured associate professor at a state university. *See* 746 F.3d at 406.  He was faculty at a school that was then part of the College of Liberal Arts at the university but that had voted to become its own college. *See id.* at 406–07.  The school had two faculties—one that had "a professional and practical orientation" and the other with "a more traditional academic orientation." *See id.* at 407.  There was serious disagreement within the school's "Structure Committee," of which the professor was a member, regarding whether the two faculties should be separated as part of the restructuring of the school into its own college. *See id.*  The professor distributed a two-page pamphlet advocating for the separation of the two faculties to some of the university's administrators, including the provost and president; members of the print and broadcast media in the state; some of his colleagues; and others. *See id.* at 406–07.  After circulating

the pamphlet, the professor claimed that the defendants—certain administrators at the university—began retaliating against him by falsely lowering his performance review scores, preventing him from serving on certain committees, preventing him from teaching certain courses, instigating internal audits, sending him an official disciplinary warning, and taking other actions that "affected his compensation and his reputation as an academic." *See id.* at 408.

The plaintiff filed suit, and the district court granted summary judgment in the administrators' favor on the grounds that the pamphlet was distributed pursuant to his employment duties under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), *see Demers*, 746 F.3d at 406, in which the Supreme Court held "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *See Garcetti*, 547 U.S. at 421. The Ninth Circuit noted, however, that, "[i]n response to a concern expressed by Justice Souter in dissent, the Court reserved the question whether its holding applied to 'speech related to scholarship or teaching.'" *See Demers*, 746 F.3d at 411 (quoting *Garcetti*, 547 U.S. at 425). The Ninth Circuit therefore "conclude[d] that if applied to teaching and academic writing, *Garcetti* would directly conflict with the important First Amendment values previously articulated by the Supreme Court," *see id.*, and "h[e]ld that academic employee speech not covered by *Garcetti* is protected under the First Amendment, using the analysis established in *Pickering*[ *v. Board of Education*, 391 U.S. 563 (1968)]." *See Demers*, 746 F.3d at 412. Under *Pickering*, "the employee must show that his or her speech addressed 'matters of public concern'" and that "the employee's interest 'in commenting upon matters of public concern' . . . outweigh[s] 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *See Demers*, 746 F.3d at 412 (quoting *Pickering*, 391 U.S. at 568).

The Ninth Circuit concluded that the pamphlet, which addressed "the nature of what was taught at the school, as well as the composition of the faculty that would teach it," *see*

*id.* at 415, "was 'related to scholarship or teaching' within the meaning of *Garcetti*." *See id.* at 414.   Further, after emphasizing that "not all speech by a teacher or professor addresses a matter of public concern," *see id.* at 415, and that "protected academic writing is not confined to scholarship," *see id.* at 416, the Ninth Circuit concluded that the pamphlet "addressed a matter of public concern within the meaning of *Pickering*['s]" first prong because it "contained serious suggestions about the future course of an important department of [the university], at a time when the . . . School itself was debating some of those very suggestions." *See id.* at 417.   The Ninth Circuit therefore reversed and remanded for the district court to address the remaining issues on the merits as necessary.   *See id.* Finally, in recognition of the fact that, "[u]ntil the decision in [*Demers*], [the Ninth C]ircuit ha[d] not addressed the application of *Garcetti* to teaching and academic writing," the Ninth Circuit also concluded that the defendants were entitled to qualified immunity as to the plaintiff's damages claims.   *See Demers*, 746 F.3d at 417–18.

Accordingly, although *Demers* generally established that academic writing and speech related to scholarship or teaching and addressing matters of public concern may be protected by the First Amendment so long as the proponent's interest is not outweighed by the state educational entity's interest in promoting the efficiency of the public services it performs through its employees, *Demers* did not establish "beyond debate" a freewheeling First Amendment right for teachers to say whatever they like in the classroom.   Indeed, the Ninth Circuit explicitly noted that "*not all speech* by a teacher or professor addresses a matter of public concern."   *See id.* at 415.   Despite Plaintiff's attempt to frame *Demers* as case about "the application of First Amendment rights to a teacher's classroom speech," (*see* Opp'n at 21), *Demers* did not concern classroom speech at all.   Rather, it addressed whether retaliatory actions taken against a professor—including preventing him from teaching certain courses—after he circulated written recommendations concerning the administration of his department to university administrators, his colleagues, and the media violated the First Amendment.   Here, by contrast, Plaintiff asserts that Defendants violated his First Amendment rights when they reassigned him from some of his courses and later

suspended him without pay for a semester for using obscenities in the classroom while he was teaching.

Mindful that "the Supreme Court has chided lower courts for 'fail[ing] to identify a case where an officer acting under similar circumstances . . . was held to have violated' the relevant constitutional provision," *see Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 891 (9th Cir. 2022) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)), the Court must conclude that the constitutional right in question was not clearly established at the time of the alleged violation because the law "had not 'placed the constitutional question beyond debate . . . *in the particular context*' of the case before [it]." *See id.* (first alteration and emphasis in original) (quoting *Sampson v. Cnty. of L.A. ex rel. L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1024 & n.10 (9th Cir. 2020)); *see also, e.g.*, *Jensen v. Brown*, No. 3:22-CV-00045-LRH-CLB, 2023 WL 6295502, at *6–8 (D. Nev. Sept. 27, 2023) (dismissing claims against defendant administrators as individuals under qualified immunity where the professor plaintiff alleged that the defendants had "sought to discipline, retaliate, and punish [him] after he [had] voiced concerns about the lowering of curriculum standards and the deterioration of share governance at [the community college]" because *Demers* "failed clearly to establish the alleged right at issue" and the plaintiff "define[d] the right too generally and fail[ed] to provide case law that clearly establishe[d] the contours of the specific right particularized to this case"), *on appeal*, No. 23-2545 (9th Cir. filed Oct. 4, 2023).  Plaintiff's additional reliance on *Hodge v. Antelope Valley Community College District*, No. CV 12–780 PSG (EX), 2014 WL 12776507 (C.D. Cal. Feb. 14, 2014), (*see* Opp'n at 21), does not change the Court's analysis.  *See Spencer v. Pew*, --- F.4th ----, 2023 WL 11929008, at *9 n.6 (9th Cir. Sept. 16, 2024) ("[D]istrict court decisions 'are insufficient to create a clearly established right.'" (quoting *Marsh v. County of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012))).  Accordingly, the Court **GRANTS IN PART** Defendants' Motion and **DISMISSES** Plaintiff's claims for damages against Defendants in their individual capacities.

/ / /

24-CV-78 TWR (MPP)

### C.     Conclusion

In light of the foregoing, the Court concludes that Plaintiff's claims against Defendants in their official capacities are barred by sovereign immunity, *see supra* Section I.A.2, and that Defendants are entitled to qualified immunity as to Plaintiff's damages claims against them in their individual capacities. *See supra* Section II.B. This leaves only Plaintiff's claims for declaratory and injunctive relief against Defendants in their individual capacities.

## II.    Sufficiency of the Pleadings

Plaintiff asserts four causes of action for (1) retaliation in violation of Plaintiff's First and Fourteenth Amendment rights against both Drs. Tong and Casper, (2) retaliation based on viewpoint in violation of Plaintiff's First and Fourteenth Amendment rights against both Drs. Tong and Casper, (3) violation of Plaintiff's substantive due process rights under the Fourteenth Amendment against Dr. Tong only, and (4) a declaration that both Drs. Tong and Casper violated CSU's "Freedom of Expression" and "Academic Freedom" Senate Policies. (*See generally* Compl.) Defendants seek to dismiss each of these claims under Rule 12(b)(6). (*See generally* Mem. at 9–22.)

### A.     First Cause of Action: First Amendment Retaliation

Plaintiff alleges that "Defendants . . . have retaliated against Plaintiff by, among other things, removing him from his classes, preventing him from performing his fundamental job duties, suspending him without pay, threatening him with further discipline, affording his students a heckler's veto over his classroom speech, and chilling his protected speech." (*See* Compl. ¶ 159.) The Parties agree that Plaintiff's speech was academic speech and that, according to the Ninth Circuit's decision in *Demers*, his First Amendment retaliation claim is therefore governed by the public concern analysis and balancing test set out in *Pickering*. (*Compare* Mem. at 10–11, *with* Opp'n at 12–13; *see also supra* Section I.B.)

> The *Pickering* test has two parts. First, the employee must show that his or her speech addressed "matters of public concern." Second, the employee's

1  interest "in commenting upon matters of public concern" must outweigh "the
2  interest of the State, as an employer, in promoting the efficiency of the public
3  services it performs through its employees."

4  *Demers*, 746 F.3d at 412 (quoting *Pickering*, 391 U.S. at 568).

### 1.  First Prong: Matter of Public Concern

6       "Speech involves a matter of public concern when it can fairly be considered to relate
7  to 'any matter of political, social, or other concern to the community.'" *Demers*, 746 F.3d
8  at 415 (quoting *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting
9  *Connick v. Myers*, 461 U.S. 138, 146 (1983))).  "The 'essential question is whether the
10 speech addressed matters of public as opposed to personal interest.'" *Id.* (quoting
11 *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009)).  "Public interest
12 is 'defined broadly[,]' . . . [and the Ninth Circuit] ha[s] adopted a 'liberal construction of
13 what an issue of public concern is under the First Amendment.'" *Id.* (quoting *Ulrich v.
14 City & Cnty. of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002); *Roe v. City & Cnty. of S.F.*, 109
15 F.3d 578, 586 (9th Cir. 1997)).  The court must "consider 'the content, form, and context
16 of a given statement, as revealed by the whole record.'" *See id.* (quoting *Connick*, 461
17 U.S. at 147–48).  "Of these, content is the most important factor." *Id.* (quoting *Desrochers*,
18 572 F.3d at 710).  "[S]tatements presenting 'mixed questions of private and public concern'
19 properly fall within the scope of First Amendment protection." *Posey v. Lake Pend Oreille
20 Sch. Dist. No. 84*, 546 F.3d 1121, 1130 n.5 (9th Cir. 2008).

21      "Whether speech is a matter of public concern under *Pickering* is a matter of law."
22 *See Demers*, 746 F.3d at 415 (citing *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th
23 Cir. 2006)).  "The plaintiff bears the burden of showing that his or her speech addresses an
24 issue of public concern." *Id.* (citing *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009)).
25 Here, Plaintiff alleges acts of retaliation that were based on speech occurring in two
26 different classes: (1) Dr. Casper's reassignment of Plaintiff from his spring semester 2022
27 Philosophy 200 and Philosophy 328 classes based on students' complaints of his use of the
28 "n-word" during lectures on the use-mention distinction, (*see, e.g.*, Compl. ¶¶ 40–44,

52–53, 78, 82, 159); and (2) Dr. Tong's subsequent one-semester suspension without pay based on Plaintiff's "Spring 2022 semester . . . use[ of] gender slurs, including 'pussy' and 'bitch,' in a derogatory manner while teaching Philosophy 512 (Political Philosophy)." (*See id.* ¶ 131; *see also id.* ¶¶ 83, 101, 105, 112, 122–23, 127, 131, 159.)   The Court analyzes the relevant speech separately.

### a. Use of the "N-word" in Philosophy 200

Although Defendants contend that Plaintiff has not plausibly alleged that his use of "n-word" in his Spring 2022 Philosophy 200 course raised matters of public concern, (*see* Mem. at 13), their analysis is limited only to Plaintiff's "gratuitous[] use[ of] gender slurs ('bitch,' 'pussy,' and 'pussy ass bitch')."   (*See id.* at 12; *see also generally id.* at 11–13.) To the extent Defendants do challenge whether Plaintiff's use of the "n-word" in Philosophy 200 addressed a matter of public concern, Plaintiff notes that "this epithet was being discussed in the context of a lesson on the 'use-mention distinction' – a fundamental concept in analytical philosophy – to distinguish when it is 'used' in a *racist* manner (i.e., directed with animus at someone) versus when it is 'mentioned' in a *racial* manner (i.e., without racist intent)," meaning "the utterance of the epithet was pedagogically relevant to the lesson."   (*See* Opp'n at 14 (emphasis in original).)

The Court concludes that Plaintiff satisfies his burden of plausibly alleging that his use of the "n-word" in Philosophy 200 related to a matter of public concern.   Although the Ninth Circuit has not yet had occasion to address a professor's use of obscenities in the classroom, the Court finds the Sixth Circuit's contrasting decisions in *Bonell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001), and *Hardy v. Jefferson Community College*, 260 F.3d 671 (6th Cir. 2001), instructive.   In *Bonell*, the professor plaintiff was disciplined by college administrators for publicly disseminating a student's complaint and his eight-page "apology" for his use of obscenities, including "'pussy,' 'cunt,' and 'fuck,'" *see* 241 F.3d at 820, during course lectures.   *See id.* at 802–08.   The Sixth Circuit concluded that the professor's distribution of the complaint involved a matter of public concern because "the public—particularly other students attending and planning to attend the College—certainly

would be interested in learning the nature of the sexual harassment Complaint lodged against Plaintiff." *See id.* at 813.   The Sixth Circuit also found that the professor's "apology" involved a matter of public concern because, "[w]hile the content of the *Apology* appears to be a personal attack on the various parties involved, the content also addresses the College's sexual harassment policy as it relates to classroom language." *See id.* at 815. As to the "classroom language [that] gave rise to the sexual harassment complaint," *see id.* at 818, however, the Sixth Circuit noted that "Plaintiff may have [had] a constitutional right to use words such as 'pussy,' 'cunt,' and 'fuck,' but he d[id] not have a constitutional right to use them in a classroom setting where they [we]re not germane to the subject matter, in contravention of the College's sexual harassment policy." *See id.* at 820 (first citing *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995); then citing *FCC v. Pacifica Found.*, 438 U.S. 726, 747 (1978)).   The court reasoned that "[t]his [wa]s particularly so when one consider[ed] the unique context in which the speech [wa]s conveyed—a classroom where a college professor [wa]s speaking to a captive audience of students, . . . who cannot 'effectively avoid further bombardment of their sensibilities simply by averting their [ears].'" *See id.* at 820–21 (final alteration in original) (quoting *Hill v. Colorado*, 530 U.S. 703, 716 (2000)).

Several months later, the Sixth Circuit issued its decision in *Hardy*, in which the adjunct instructor plaintiff's contract was not renewed after a student complained about his "in-class use of the words 'nigger' and 'bitch'" during a "lecture on language and social constructivism, where the students examined how language [wa]s used to marginalize minorities and other oppressed groups in society." *See* 260 F.3d at 674–75.   The Sixth Circuit distinguished *Bonell*, noting that, "[u]nlike Bonnell's frequent in-class use of gratuitous profanity and offensive language . . . , Hardy's speech was germane to the subject matter of his lecture on the power and effect of language." *See Hardy*, 260 F.3d at 679.   The Sixth Circuit therefore concluded that "Hardy's in-class speech . . . relate[d] to matters of overwhelming public concern—race, gender, and power conflicts in our

/ / /

society." *See id.* (citing *Bonnell*, 241 F.3d at 816; *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994)).

The relevant inquiry, therefore, is whether Plaintiff's use of the "n-word" in his spring semester 2022 Philosophy 200 course was "germane to the subject matter of his lecture" on the use-mention distinction. The Court concludes that it was—Plaintiff alleges that his use of the "n-word," along with other racial epithets, was part of a

> class discussion regarding the analytical distinction between the "use" as opposed to the "mention" of such words[,] . . . teach[ing] students how to analyze the linguistic and logical distinction between "racial" and "racist" language, i.e., that one's *use* of words entails that one believes with racist animus that the words in question apply to a particular person or group; but the mere *mention* of such words does not involve racist intent on the part of the speaker.

(*See* Compl. ¶ 41 (emphasis in original).) Plaintiff's allegations are corroborated by the student statements collected by the DOJ's independent investigator in her comprehensive Report. (*See* Defs.' Ex. 4 at 52–61.) Because Plaintiff's use of the "n-word" during Philosophy 200 was germane to the subject matter, the Court finds that Plaintiff has met his burden of alleging that his speech related to a public concern under the first prong of the *Pickering* test. *See, e.g.*, *Hardy*, 260 F.3d at 679; *Bonnell*, 241 F.3d at 820; *Hodge*, 2014 WL 12776507, at *8 (concluding that EMT's lesson plan on "Political correctness vs. the real world" that was "filled with both hypotheticals and real life examples of situations in which an EMT must cope with diverse cultures as well as offensive language" "was not merely gratuitous profanity, but was germane to an academic discussion of the words themselves, along with how an EMT should handle emotionally charged emergencies while in the field").

### b.   Use of Gender Slurs in Philosophy 512

Plaintiff also challenges his suspension without pay following complaints regarding his use of the words "pussy" and "bitch" in his spring semester 2022 Philosophy 512 course. (*See, e.g.*, Compl. ¶¶ 83, 101, 105, 112, 122–23, 127, 131, 159.) Defendants contend that Plaintiff's use of these terms did not raise a public concern because, "[l]ike

the professor in *Bonnell*, plaintiff gratuitously used gender slurs ('bitch,' 'pussy,' and 'pussy ass bitch') and created a culture of intimidation towards a captive audience (referring to people who were offended as 'pussies')." (*See* Mem. at 12.) Plaintiff responds that "the words 'bitch' and 'pussy' . . . were referenced in a classroom lecture and discussion regarding the ambiguity of certain language," meaning that they were "pedagogically relevant" and therefore subject to First Amendment protection. (*See* Opp'n at 15.)

The Court is mindful that it must accept Plaintiff's allegations as true and construe them in the light most favorable to him for purposes of Defendants' Motion. That said, the Court also has found it appropriate to incorporate by reference several exhibits propounded by both Parties that are central to Plaintiff's causes of action, including the Report. *See supra* pp. 4–7. Although Defendants urge that the "Court may consider that report, and treat its findings as true," (*see* Reply at 3 (citing *Khoja*, 899 F.3d at 1002)), the Court declines to accept as true the investigator's "Findings of Relevant Facts," (*see* Defs.' Ex. 4 at 76–81), and "Statement of Decision on Merits," (*see id.* at 81–90), given that the investigator reached these conclusions based upon her own weighing of the evidence and her application of the relevant policies to her factual findings. The Court does, however, conclude that it may consider the allegations that the investigator uncovered by speaking with Plaintiff's students and reviewing the materials they submitted to the administration and each other during Plaintiff's course and in the months following it. (*See* Defs.' Ex. 4 at 65–75.) Accordingly, to the extent that the evidence compiled by the investigator renders Plaintiff's conclusory allegations implausible, the Court may appropriately disregard Plaintiff's allegations. *See, e.g.*, *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1008 (9th Cir. 2015) ("[The court] need not accept as true allegations contradicting documents that are referenced in the complaint." (quoting *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008)).

Reviewing the students' statements and construing them most favorably to Plaintiff, the Court concludes that Plaintiff "used the word 'pussy' and 'bitch' in the Philosophy 512

class" and that he "used the word 'pussy' to refer to people or groups as weak or not assertive." (*See* Defs.' Ex. 4 at 66; *see also generally id.* at 65–71.)  Because Plaintiff did not recall using the word "pussy" in Philosophy 512 and did not address his use of the word "bitch" in that class, (*compare id.* at 71, *with id.* at 63 (Plaintiff explaining that, in Philosophy 200, he "g[ave] the word 'bitch' as an example of what he believes is the most ambiguous word in the English language")), he has failed to meet his burden of demonstrating that his use of the words "pussy" and "bitch" was germane to the subject matter of the course, which "cover[ed] '[s]elected aspects of the political structures within which we live, such as law, rights, sovereignty, justice, liberty, welfare[,]' . . . includ[ing] international law and global justice, human over-reproduction and population, human immigration (both legal and illegal), and reparations."  (*See* Defs.' Ex. 4 at 52.) Consequently, the Court concludes that Plaintiff has failed sufficiently to allege that his use of the words "pussy" and "bitch" in Philosophy 512 was related to matters of public concern under the first prong of the *Pickering* test and, therefore, **DISMISSES** Plaintiff's first cause of action to the extent it is predicated on his use of gender slurs in Philosophy 512.  *See, e.g.*, *Bonnell*, 241 F.3d at 820; *see also, e.g.*, *Demers*, 746 F.3d at 414 (concluding that plaintiff "failed to establish a First Amendment violation with respect to" draft chapters of his book where he failed to introduce them into the record and therefore had "provided insufficient information . . . to support a claim that any such retaliation resulted from those drafts"); *Abdulhadi v. Wong*, No. 18-CV-04662-YGR, 2022 WL 842588, at *7 (N.D. Cal. Mar. 4) (concluding that the plaintiff had failed to support her claim for First Amendment retaliation where she had failed to submit the underlying Facebook post), *appeal dismissed*, No. 22-15493, 2022 WL 2421098 (9th Cir. Apr. 28, 2022).

### 2.   Second Prong: Balancing of Interests

"Once a plaintiff shows that his or her statements were of public concern, the burden shifts to the defendant to show that, under the *Pickering* balancing test, its legitimate administrative interests in regulating the speech outweigh the plaintiff's First Amendment rights."   *Reges v. Cauce*, No. 2:22-CV-00964-JHC, 2024 WL 2140888, at *11 (W.D.

Wash. May 8, 2024) (quoting *Hodge*, 2014 WL 12776507, at *9 (citing *Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir. 2001))).  Defendants have little to say in this regard, arguing only that

> decades of Supreme Court jurisprudence teaches that a university has a profound interest in determining its own curriculum, determining who is to teach a course, and determining how it is to be taught.  And that interest was especially profound here.  Plaintiff's speech was disruptive, led to student complaints, and led five of eight women in Philosophy 512 to drop out.

(*See* Mem. at 13.[12])  Defendants also fail adequately to address their interests with respect to Plaintiff's Philosophy 200 course in particular, focusing instead on the admittedly alarming number of female students who dropped Plaintiff's Philosophy 512 course.  (*See id.*)

    In any event, "[b]ecause of the inherently fact-intensive nature of this inquiry, the Court can rarely perform the *Pickering* balancing on a motion to dismiss."  *Reges*, 2024 WL 2140888, at *11 (first citing *Guadalupe Police Officer's Ass'n v. City of Guadalupe*, No. CV 10-8061 GAF (FFMx), 2011 WL 13217672, at *10 (C.D. Cal. June 8, 2011); then citing *Montclair Police Officers' Ass'n v. City of Montclair*, No. CV 12-6444 PSG (PLAx), 2012 WL 12888427, at *7 (C.D. Cal. Oct. 24, 2012)).  Accordingly, at this early stage in the proceedings and for purposes of Defendant's Motion, the Court concludes that Plaintiff states a plausible claim for First Amendment retaliation as to his use of the "n-word" in his spring 2022 Philosophy 200 course.  The Court therefore **DENIES IN PART** Defendants'

---

[12]    Defendants did provide a more fulsome argument in their Reply, (*see* Reply at 4–6), but that is too little, too late—by only raising these arguments in their Reply, they denied Plaintiff the opportunity to respond.  *See, e.g.*, *Cross v. HFLP - Dolphin Beach, LLC*, No. 15CV2506-MMA (DHB), 2017 WL 2794339, at *11 (S.D. Cal. June 28, 2017) ("Defendant did not cite to any cases until its reply brief, depriving Plaintiff of the chance to respond to Defendant's reliance on those cases. . . .  [I]t is inappropriate for parties to raise new legal arguments in their reply briefs, and district courts may disregard such arguments.").  In any event, like the arguments in the Opposition, Defendants' arguments in their Reply are also directed primarily at the disruptions Plaintiff's speech wreaked in his Philosophy 512 course, which claim does not proceed to the *Pickering* balancing test as currently pleaded.  *See supra* Section II.A.1.b.

Motion to the extent it seeks dismissal of Plaintiff's first cause of action as to his use of the "n-word" in his spring 2022 Philosophy 200 course.

### B.   Second Cause of Action: First Amendment Retaliation Based on Viewpoint

Plaintiff conceded at oral argument that he has abandoned his second cause of action for viewpoint retaliation.  (*See* ECF No. 23.)  The Court therefore **GRANTS IN PART** Defendants' Motion and **DISMISSES** Plaintiff's third cause of action.

### C.   Third Cause of Action: Substantive Due Process

In his third cause of action, Plaintiff alleges that Defendant Tong violated Plaintiff's substantive due process rights under the Fourteenth Amendment because "CSU's Nondiscrimination Policy, as it defines 'harassment,' fails to provide adequate notice of the conduct proscribed because it relies on ambiguous and undefined terms, and allowed a state official, Defendant Tong, acting under color of state law to decide whether harassment has occurred based on ad hoc and subjective criteria that were unknown to Plaintiff." (*See* Compl. ¶ 178.)  To the extent it is not preempted by the First Amendment, Plaintiff clarified at oral argument that his third cause of action alleges that CSU's Nondiscrimination Policy is void for vagueness.  (*See* ECF No. 23.)

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Consequently, "laws [must] give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and "provide explicit standards for those who apply them."  *See id.*  Relying on several cases, Defendant Tong argues for dismissal of Plaintiff's third cause of action on the grounds that "the term 'harassment' is not of such complexity that professors cannot be expected to know what it means."  (*See* Mem. at 20; *see also generally id.* at 19–21.)  Plaintiff responds that "CSU's definition of both 'harassment' and 'because of' leaves someone in Dr. Corlett's position without any reasonable warning of what verbal conduct is prohibited and under what circumstances."  (*See* Opp'n at 20; *see also generally id.* at 18–20.)  Defendant Tong rejoins that "[t]he Ninth Circuit and other courts have repeatedly found 'harassment' falls well

within the understanding of persons of ordinary intelligence."  (*See* Reply at 7 (citing *O'Brien v. Welty*, 818 F.3d 920, 930 (9th Cir. 2016); *United States v. Osinger*, 753 F.3d 939, 944 (9th Cir. 2014); *Keating v. Univ. of S.D.*, 569 F. App'x 469, 470 (8th Cir. 2014); *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012)).

Based on the authorities marshalled by Defendant Tong, the Court agrees that the definition of "harassment" in CSU's Nondiscrimination Policy is not unconstitutionally vague.  Not only is the word "harassment" reasonably understood by those of ordinary intelligence, but Plaintiff's argument that the definition of "because of" is unconstitutionally vague is also without merit.  *See, e.g.*, *Passananti v. Cook Cnty.*, 689 F.3d 655, 665–66 (7th Cir. 2012) (noting in employment context that "[a] raft of case law . . . establishes that the use of sexually degrading, gender-specific epithets, such as 'slut,' 'cunt,' 'whore,' and 'bitch' . . . has been consistently held to constitute harassment based upon sex" (second and third alterations in original) (quoting *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229–30 (1st Cir. 2007) (citing *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000–01 (10th Cir. 1996))) (citing *Burns v. McGregor Elec. Indus.*, 989 F.2d 959, 964–65 (8th Cir. 1993); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990))); *see also, e.g.*, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 812–13 (11th Cir. 2010) (en banc) (noting in employment context that "[i]t is not fatal to her claim that [the plaintiff]'s co-workers never directly called her a 'bitch,' a 'fucking whore,' or a 'cunt[]'" and that, "even accepting that [the plaintiff]'s co-workers sometimes used the terms 'bitch' and 'whore' to refer to men, this usage may not make the epithets any the less offensive to women on account of gender").  Accordingly, the Court **GRANTS IN PART** Defendants' Motion and **DISMISSES** Plaintiff's third cause of action against Defendant Tong.

### D.   *Fourth Cause of Action: Declaratory Relief*

Finally, Plaintiff asserts a claim under the Declaratory Judgment Act, 28 U.S.C. § 2201, for "a declaration that Defendants Monica Casper, William Tong, and DOES 1–50 violated his rights to free speech and academic freedom under the CSU Senate Policy."

51

(*See* Compl. ¶ 193.)  Defendants contend that "Plaintiff's claim for declaratory relief fails as a matter of law, because the policies he cites—'Freedom of Expression' and 'Academic Freedom'—*are not CSU policies*" and "are not binding on CSU."  (*See* Mem. at 21 (emphasis in original).)  Plaintiff responds that he alleges that "his rights to freedom of speech and academic freedom in the classroom were clearly established and guaranteed by the First Amendment to the U.S. Constitution and by CSU Senate Policy," (*see* Compl. ¶ 190), and that he specifically prays for "[a] declaratory judgment stating that Defendants' disciplinary action and punishment . . . violated his rights to free speech and academic freedom . . . under the First and Fourteenth Amendments to the United States Constitution," (*see* Compl. Prayer ¶ 1).  (*See* Opp'n at 21–22.)  But Plaintiff also requests, "[t]o the extent that the Fourth Cause of Action lacks clarity in this respect, leave to file a First Amended Complaint to make it clear that he is seeking declaratory relief with respect to the violation of his constitutional rights, and not merely with respect to the CSU Senate Policy."  (*See id.* at 22.)

Because it appears that Plaintiff concedes that his request for declaratory relief is subject to dismissal to the extent it is directed to the CSU Senate Policy, the Court **GRANTS IN PART** Defendants' Motion and **DISMISS** Plaintiff's fourth cause of action to the extent it seeks a declaration of his rights under the CSU Senate Policy.  Defendants noted at oral argument that they were not opposed to Plaintiff being granted leave to amend as to his fourth cause of action, so Plaintiff will be permitted to further clarify his fourth cause of action if he elects to file an amended complaint in this Court.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Judgment on the Pleadings (ECF No. 15).  Specifically, the Court **DISMISSES WITH PREJUDICE** Plaintiff's claims against Defendants in their official capacities and Plaintiff's claims for damages against Defendants in their individual capacities; **DISMISSES WITHOUT PREJUDICE** Plaintiff's first cause of action to the extent it is predicated on Plaintiff's alleged use of gender slurs in his spring semester 2022

Philosophy 512 course, Plaintiff's second cause of action as abandoned, Plaintiff's third cause of action in its entirety, and Plaintiff's fourth cause of action to the extent it is directed to the CSU Senate Policy.  Defendants' Motion is otherwise **DENIED**.  Should Plaintiff elect to proceed in federal court, Plaintiff **MAY FILE** an amended complaint curing the deficiencies identified in this Order within <u>twenty-one (21) days of its electronic docketing</u>. *Should Plaintiff elect not to file an amended complaint by the ordered deadline, this case* ***SHALL PROCEED*** *as to Plaintiff's surviving cause(s) of action.*

      **IT IS SO ORDERED.**

Dated:  September 20, 2024

_____

Honorable Todd W. Robinson
United States District Judge

24-CV-78 TWR (MPP)