ARTHUR I. WILLNER, State Bar No. 118480
awillner@leaderberkon.com
LEADER BERKON COLAO & SILVERSTEIN LLP
445 South Figueroa Street, Suite 2980
Los Angeles, CA 90071
Telephone: (213) 234-1750
Facsimile:  (213) 234-1747

**ATTORNEYS FOR PLAINTIFF**
J. ANGELO CORLETT, Ph.D.

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **J. ANGELO CORLETT, Ph.D.**, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> **WILLIAM TONG**, in his individual capacity; **MONICA CASPER,** in her individual capacity; and DOES 1 THROUGH 50, inclusive, <br><br> Defendants. | Case No.  3:24-CV-00078-TWR-MMP <br><br> **PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

1.      Plaintiff J. Angelo Corlett, Ph.D., by and through his counsel of record, and for his Complaint against Defendants William Tong and Monica Casper, in their individual capacities, and against DOES 1 through 50, states as follows:

*(sidebar)* Leader Berkon Colao & Silverstein LLP — Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

# INTRODUCTION

2.      As a public university, California State University, San Diego ("SDSU") and its administrators and officials are bound by the First Amendment's guarantees of freedom of speech and academic freedom as well as the Fourteenth Amendment's guarantees of due process.

3.      A public college or university has no business regulating, much less censoring and penalizing, faculty members for engaging in pedagogically relevant classroom speech.  Yet this is precisely what officials of SDSU and Defendants Tong and Casper did when they repeatedly investigated and disciplined Professor J. Angelo Corlett based on his classroom speech in certain of his Philosophy courses. Operating under color of state law, Defendants knowingly violated Dr. Corlett's First and Fourteenth Amendment rights for no reason other than to assuage the feelings of and bow to complaints brought by a few students who took offense at his classroom speech.  Contrary to the apparent view of SDSU and Defendants Tong and Casper, a faculty member's constitutional rights cannot be bargained away to satisfy the feelings of a handful of students.

4.      Furthermore, the administrators of a public college or university may not enforce disciplinary rules that fail to give a faculty member like Dr. Corlett fair notice of what is proscribed or interpret them in a manner that is contrary to their plain language or so standardless that it invites arbitrary and subjective enforcement in violation of Dr. Corlett's First Amendment rights.

5.      Defendant Tong's enforcement of SDSU's Nondiscrimination Policy, as applied to Dr. Corlett, failed to provide him with fair notice of what conduct might be proscribed, and swept within its ambit pedagogically relevant classroom speech. Operating under color of state law, Defendant Tong and other SDSU officials knew or should reasonably have known that they were construing the Nondiscrimination Policy prohibiting "harassment" in a manner that was directly

- 2 -

contrary to its plain language, allowed for the enforcement of the rules on an ad hoc and completely subjective basis, afforded purportedly "offended" students with a heckler's veto, and violated Dr. Corlett's right to teach pedagogically relevant material.

6.      Dr. Corlett's experience is but one example of what has become a dangerous assault on First and Fourteenth Amendment rights on college campuses nationwide by administrators and officials, often but not always pressured by students, to suppress the speech of anyone with whom they disagree.  Once regarded as the "marketplace of ideas," *Keyishian v. Board of Regents*, 364 U.S. 479, 487 (1967), college campuses in recent years have increasingly devolved into environments where only acceptable viewpoints may be publicly expressed, even in the classroom, while differing views are subject to investigation and even punishment.  The clear purpose of this illiberal movement is not merely to investigate and discipline those, like Dr. Corlett, whose pedagogical lectures, class discussions, and subject matter might cause discomfort in certain students, but to chill the speech of and serve as a warning to Dr. Corlett and other faculty members that the better course of action is to self-censor rather than risk suffering adverse employment consequences.

7.      The actions of Defendants ignore the fundamental principle that neither students nor faculty "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Indpt. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1968).  Indeed, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972).

8.      Dr. Corlett brings this action to hold Defendants accountable for the violation of his rights to free speech and academic freedom.

///

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

## JURISDICTION AND VENUE

9.      This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

10.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

11.     This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorneys' fees under 42 U.S.C. § 1988.

12.     Venue is proper under 28 U.S.C. § 1391 in the Southern District of California because a substantial part of the actions or omissions giving rise to this case occurred within the Southern District and at least one Defendant resides in the Southern District.

## THE PARTIES

13.     At all times relevant to this action, Plaintiff J. Angelo Corlett, Ph.D. is and was a resident of San Diego, California and has been employed by California State University ("CSU") as a tenured full Professor in the Department of Philosophy of SDSU.

14.     At all times relevant to this action, Defendant William Tong is and was the Interim Provost and Senior Vice President employed by SDSU.  Defendant Tong acted under color of state law when he violated Plaintiff's First and Fourteenth Amendment rights.  He is sued in his individual capacity.

15.     At all times relevant to this action, Defendant Monica Casper was the Dean of the College of Arts and Letters employed by SDSU.  Plaintiff is informed and believes that Casper no longer holds that position and is no longer employed at SDSU.  Defendant Casper acted under color of state law when she violated

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Plaintiff's First and Fourteenth Amendment rights.  She is sued in her individual capacity.

16.    Plaintiff is informed and believes that DOES 1 through 50 are other officials and administrators employed at SDSU who are also responsible for the improper actions against Plaintiff detailed below, or are necessary parties, and Plaintiff will amend this Complaint when their true identities are known.

## FACTUAL BACKGROUND

### A.    Dr. Corlett's Professional Background

17.    Plaintiff J. Angelo Corlett, Ph.D. is a tenured full Professor and has been employed on the faculty of SDSU's Department of Philosophy for over twenty-five years.  For more than three decades, his areas of specialty include, among others, ethics, social and political philosophy, academic freedom, and the philosophy of law including issues pertaining to racism, justice, and the use of language.  He is an award-winning academic, is widely published and is regarded as a world-renowned philosopher in his fields.  Thanks to his mentorship, many of Dr. Corlett's students at SDSU have moved on to successful careers in academia as well.  During his long career at SDSU, Dr. Corlett has brought nothing but prestige and acclaim to the university's Department of Philosophy.

18.    Over his many years at SDSU, Dr. Corlett has consistently received positive course evaluations given by students in classes he has taught, and has won about a dozen teaching awards, despite having the reputation of being the Philosophy Department's toughest grader.  Consistent with his responsibilities as a Professor of Philosophy, throughout his career Dr. Corlett has regularly challenged his students to address philosophical issues on controversial topics, such as racism or the death penalty or abortion, that may engender some discomfort or even

- 5 -

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

offense.  Nonetheless, Dr. Corlett has always conducted his classes fairly with respect to his students' age, gender, race, religion, disability, and sexual orientation.

19.    Furthermore, Dr. Corlett's lectures and class discussions have always involved pedagogically relevant material constituting protected speech under the First Amendment and the principles of academic freedom.  Indeed, more than six decades ago the Supreme Court made it crystal clear with respect to classroom teaching that "The essentiality of freedom in the community of American universities is almost self-evident" and that "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

20.    In February 2019, Dr. Corlett published an essay, "Offensiphobia," in the Journal of Ethics – one of the world's leading journals of philosophical research on matters of substantial relevance to the work of academics, researchers, and students.  The essay explains that it "provides a critical philosophical assessment of 'offensiphobia,' which is the belief that higher educational academic freedom ought to be to some important extent censured because of the mere offensiveness of certain kinds of expressions, whether those expressions are perceived as being racist, sexist, etc., effectively holding that the offensiveness of such expressions is a sufficient condition to justify its prohibition."

21.    It is beyond ironic – indeed, it is a stain on the reputation of SDSU – that one of the preeminent ethicists in academia that has written on the very subject of censorship in higher education has himself been "cancelled" by his university based on offense taken by a handful of students to the protected speech he expressed in class.

22.    Dr. Corlett's classroom speech (discussed in detail below) about which a handful of students complained in 2022 had been included in his lectures and

class discussions of the pertinent issues with thousands of students over more than a quarter of a century without issue. Dr. Corlett's teaching of such issues has been based on his peer-reviewed works, including Corlett, "Race, Racism and Reparations" (Cornell University Press, 2003); Corlett, "'For All My Niggaz and Bitches': Ethics and Epithets" (Open Court, 2005); and Corlett, "Offensiphobia" (Journal of Ethics, 2018).

23.    On March 19, 2021, in evaluating Dr. Corlett in his Periodic Review of Tenured Faculty, Dr. Steve Barbone, Chair, Philosophy Department, SDSU, noted "the breathtaking scope and depth of your achievements during [the 2015-2020 review period]." Furthermore, Chair Barbone also noted that Dr. Corlett's professional achievements "does not in any way seem to inhibit your being a very successful instructor." In addition, regarding Dr. Corlett's reputation as a first-rate teacher, Chair Barbone observed: "[I]t is also not surprising that students would nominate you for various teaching awards here at San Diego State. You were a Favorite Faculty Award Finalist for 2017-2018, and you won the SDSU Compact Scholars Teaching Award in 2015, an award given to a faculty member nominated by SDSU students of color for outstanding teaching/mentoring."

24.    In addition, in evaluating Dr. Corlett in his March 5, 2021 Periodic Evaluation of Tenured Faculty, Professor Robert Francescotti, SDSU's Chair of the Philosophy Department RTP Committee, observed that, "Students laud your passion for teaching, vast knowledge of the subject matter, sense of humor, ability to inspire discussion, and concern for students and their success." Professor Francescotti further stated, "We commend you for your invaluable service in addition to your dedication to teaching excellence and the massive amount of quality research you do and its world-renowned impact."

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

**B.    SDSU's Policies Guarantee Freedom of Speech and Academic Freedom.**

25.    SDSU's Senate Policy File, "Freedom of Expression," contains in relevant part the following policies and procedures.

26.    1.0 Principles: SDSU expressly recognizes that the university is bound by, and its faculty enjoy the constitutional protections of the First Amendment, Section 2 of the Constitution of the State of California, and California Education Code (sec. 66301).

27.    1.1:  Furthermore, SDSU recognizes that "Freedom of expression is a tenet of higher education; is integral to the mission of the University and to its students, staff, and faculty; is a central and inviolate freedom to learn and teach; necessary for an educated populace; is a requisite to a free society; is incompatible with the suppression of opinions; is incompatible with prior restraint; encompasses forms of expression other than speech; and **defends the expression we abhor as well as the expression we support.**"  (Emphasis added.)

28.    2.0:  Although "reasonable regulations may be designed to avoid disruption of the mission of the University," these regulations must be "**consistent with the limits of the law.**"  (Emphasis added.)

29.    2.3: "This policy should **in no way be regarded as placing prohibitions beyond those prescribed by law or section 2.1 hereof on the right to express political, religious, philosophical, ideological, or academic viewpoints by any individual on the SDSU campuses.**"  (Emphasis added.)

30:    3.1:  The exercise of free speech at SDSU may be subject to "appropriate time, place, and manner regulations" in order to "ensure that the university's mission of instruction, research, and creative activity is not disrupted, and that campus safety and security are not compromised."  Furthermore, **"Regulation of noncommercial free speech and free expression activities shall**

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

**be content neutral.  All legal speech, even offensive speech, is permitted.”** (Emphasis added.)

31.    In addition to codifying its commitment to content-neutral freedom of speech, SDSU’s written policies also profess to support academic freedom.  Its Senate Policy File, “Academic Freedom,” states in relevant part as follows.

32.    “San Diego State University is **committed to academic freedom as a core value** that underlies its mission and teaching, scholarship and creative activity, and service to the public, our University, and the larger scholarly community. Academic freedom, whether reflected in formal research and publication, teaching, creative activity, or in the exploration of new ideas, benefits the campus community and the world at large and should be defended by faculty, instructional staff, and students.”  (Emphasis added.)

33.    SDSU’s policies on Academic Freedom also state as a goal to “develop in its students a sense of thoughtful independence,” and that to accomplish this “the instructional staff must be free within the classroom to **explore the widest possible range of viewpoints.**”  The policies further note that “The validity of academic ideas, theories, arguments and views **should be measured against the intellectual standards of relevant academic and professional disciplines.** Application of these intellectual standards does not mean that all ideas have equal merit.  The responsibility to judge the merit of competing academic ideas rests with colleges and universities to and is **determined by reference to the standard of the academic profession.**”  (Emphasis added.)

34.    At all times relevant to this action, SDSU and Defendants were aware of the University’s guarantees of freedom of speech and academic freedom, of the fact that these guarantees and the standards for ensuring them were expressly set forth in the University’s written policies and procedures, and that these policies and procedures were expressly consistent with First Amendment law.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

**C.    CSU's Policies and Procedures Regarding Gender-Based Harassment.**

35.    CSU's "Nondiscrimination Policy" defines "harassment" as follows:

Harassment means unwelcome verbal, nonverbal or physical conduct engaged in **because of** an individual Complainant's Protected Status.

If a Complainant is harassed **because of** their Protected Status, that means the Complainant's Protected Status is a substantial motivating reason (but not necessarily the only reason) for the conduct.

Harassment may occur when:

a. Submitting to, or rejecting, the verbal, nonverbal or physical conduct is explicitly or implicitly a basis for:

***

    ii. Decisions that affect or threaten the Complainant's academic status or progress, or access to benefits and services, honors programs, or activities available at or through the university.

    **OR**

b. The conduct is sufficiently severe or pervasive so that its effect, whether intended or not, could be considered by a reasonable person under similar circumstances and with similar identities, and is in fact considered by the Complainant as creating an intimidating, hostile or offensive work or educational environment that denies or substantially limits an individual's ability to participate in or benefit from employment and/or educational, services, activities, or other privileges provided by the CSU.

Harassment includes, but is not limited to, verbal harassment (e.g., epithets, derogatory comments, or slurs), physical harassment (e.g., assault, impeding or blocking movement, or any physical interference with normal work or

- 10 -

movement), and visual forms of harassment (e.g., derogatory posters, cartoons, drawings symbols, or gestures). Single, isolated incidents will typically be insufficient to rise to the level of harassment.

(Article VII.A.2.)

(Emphasis in original.)

36.    CSU's Nondiscrimination Policy, including its definition of "harassment," is binding on and followed by SDSU and Defendants.

37.    Defendant Tong failed to apply the plain language of CSU's Nondiscrimination Policy to Dr. Corlett's protected speech.  Instead, Defendant Tong retaliated against him for his exercise of protected speech and academic freedom by applying the Nondiscrimination Policy in a manner that Dr. Corlett could not have anticipated and that made it virtually impossible for Dr. Corlett to know what classroom speech was or was not prohibited thereby violating his First and Fourteenth Amendments.

**D.    Dr. Corlett is Removed from His Classes Based on His Use of Pedagogically Relevant Language.**

38.    In the spring semester of 2022, Dr. Corlett was assigned to teach three classes two of which were Philosophy 328, "Philosophy, Racism, and Justice," and Philosophy 200, "Critical Thinking and Composition."

39.    On March 1, 2022, one or two students (including a visitor not even enrolled in the class) complained that Dr. Corlett had "used" racial and other epithets during these classes.

40.    As he explained to his students, however, Dr. Corlett's discussion of these epithets was pedagogically relevant to his class discussion regarding the analytical distinction between the "use" as opposed to the "mention" of such words. The use-mention distinction is a fundamental concept in analytical philosophy and

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

was critically important to Dr. Corlett's lecture and class discussion regarding issues concerning language and racism.  It teaches students how to analyze the linguistic and logical distinction between "racial" and "racist" language, i.e., that one's *use* of words entails that one believes with racist animus that the words in question apply to a particular person or group; but the mere *mention* of such words does not involve racist intent on the part of the speaker.  In order to make this point, one must mention the epithets in question in order to inform the class as to what does and does not constitute racist language.

41.    At no time during these classes did Dr. Corlett direct any epithets, racial or otherwise, or condone or make any statements condoning such conduct, toward any student in the class.  Nor has he ever been accused of doing so.  Furthermore, there is no evidence that Dr. Corlett ever responded disrespectfully toward the two students who objected to his language.  Nor has he ever been accused of doing so.

42.    The vast majority of the students in these classes understood the relevance of Dr. Corlett's mention of this language to the subject matter of the classes and actively participated in the discussion.

43.    Later that same day, on March 1, 2022, Dr. Corlett received two identical emails (each pertaining to one of the classes) from Defendant Casper.  Casper's emails read as follows:

"Dear Professor Corlett, I'm writing to let you know that, effective immediately, I am reassigning you from your [course name].  There have been numerous student complaints and it is clear you are not effective in the course.  I ask that you work with Chair Barbone, cc'ed here, to find a suitable reassignment.  Please note that this reassignment will not impact your pay; you will continue to receive your full salary.  Should you have any questions or concerns, I encourage you to reach out to Sasha Chizhik.  Best, Monica."

- 12 -

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF; DEMAND FOR JURY TRIAL
Case No.  3:24-CV-00078-TWR-MMP

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

44.    At no time prior to sending these emails did Casper provide Dr. Corlett with notice of her intention to remove him from these classes; nor did she ever explain the reason(s) for her decision or provide him with an opportunity to defend himself or to respond to the purported "numerous" complaints, or to even explain what had actually occurred during these classes.  She also did not notify him of what he had done wrong or what CSU or SDSU rule or policy, if any, he had purportedly violated.  Her emails also failed to explain the basis for her conclusion that, after three decades of teaching philosophy, excellent teaching evaluations and several teaching awards, Dr. Corlett was somehow no longer "effective" in these courses.  Nor did Dean Casper's emails state the number of student complaints, the identities of those students, the substance of their complaints, or the definition of "effective" as used in her emails.

45.    At no time prior to sending these emails asserting that Dr. Corlett was "not effective" in these courses did Casper ever observe even a single moment of any of his classes.

46.    Plaintiff is informed and believes and thereon alleges that, at the time she summarily removed him from these classes asserting that he was "not effective" in the courses, Casper was aware of Philosophy Chair Barbone's March 19, 2021 Periodic Review of Tenured Faculty in which Dr. Barbone extolled Dr. Corlett as a "very successful instructor," including with respect to his teaching and mentoring of students of color, and Professor Francescotti's March 5, 2021 Periodic Evaluation of Tenured Faculty in which he lauded Dr. Corlett's passion for teaching, ability to inspire class discussions, and concern for students and their success.

47.    Plaintiff is informed and believes and thereon alleges that Casper was similarly aware that Chair Barbone had previously praised Dr. Corlett for, among other things, his success in teaching and mentoring students of color.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

48.    Plaintiff is informed and believes and thereon alleges that Casper has no degrees in Philosophy and no background teaching that subject matter.

49.    In short, Casper made her decision that Dr. Corlett was no longer "effective" in the classroom in complete disregard of his teaching abilities and record and the subject matter of the courses.

50.    Dr. Corlett ultimately learned that the reason for Casper's decision was that some students allegedly took offense over some of the language they heard in these classes.

51.    More specifically, it became clear during the ensuing days, based upon comments from other SDSU administrators, that the basis for Casper's decision was that certain students (including the individual who had attended but was not enrolled in his class) had complained about Dr. Corlett's utterance of the "n-word" and some other epithets during his classroom lecture and class discussion.

52.    Dr. Corlett's statements regarding the "n-word" and other epithets were consistent with and relevant to the use-mention distinction discussed in paragraph 41 above, which is a fundamental concept in philosophy.

53.    At no time did Dr. Corlett's classroom speech disrupt the university's mission of instruction, research, and creative activity.  It did not impede his ability to teach his courses or his students' ability to learn.  Nor did his classroom speech ever compromise campus safety and security.  Indeed, as discussed immediately below, it was the reactions of Casper and a few students to Dr. Corlett's speech that compromised *his* safety and security and potentially that of his other students as well.

54.    On March 10, 2022, Casper along with SDSU in-house counsel Jessica Rentto met with Dr. Corlett and his attorney.  Casper initiated that meeting in order to advise Dr. Corlett that an outside community organization, which may or may not have included students, was planning to stage a protest at his one remaining

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

class.  Casper further advised Dr. Corlett that in the interests of their right to free speech, the protesters would not only be permitted inside the building in which his class was being held but would also be allowed to bring their protest inside the classroom itself.  In other words, it was Casper's position that the protesters' First Amendment rights included *disrupting* Dr. Corlett's class, intimidating him and interfering with his students' ability to learn, whereas Dr. Corlett's pedagogically relevant lecture which was indisputably protected speech was not only unworthy of protection but deserving of censure.  The distinction was obvious: Dean Casper agreed with the viewpoint of the protesters regarding the scope of his classroom speech but vehemently disagreed with that of Dr. Corlett.

55.    Apparently finally recognizing the danger she had at best, unwittingly, or at worst, deliberately, unleashed by her actions, Casper agreed to provide security for Dr. Corlett on campus and permitted him to relocate his class to a more secure location.

56.    Dr. Corlett is informed and believes and thereon alleges that Dean Casper made her decision to remove him from his classes based solely upon her disagreement with his pedagogically relevant teaching and/or her sympathy with students who disagreed with it notwithstanding that neither she nor the students were qualified to make that determination.

57.    Dr. Corlett is informed and believes and thereon alleges that Casper's decision was motivated, either in full or in part, by her predisposition against pedagogy that she regards as aligned with viewpoints with which she disagrees including, among other things, the ability and necessity of students to hear discussions in class of pedagogically relevant words, language, and ideas that they might find offensive or cause discomfort.

58.    On December 1, 2021, three months prior to removing Dr. Corlett from his classes, Dean Casper publicly tweeted the following: "Just so we're clear

on the Right's agenda: racism good, abortion bad, money good, women bad, capitalism good, sustainability bad, stupidity good, science bad, power good, equality bad, white people good, nonwhite people bad.  Stench, indeed."

59.    In response to Casper's tweet, SDSU President Adela de la Torre released the following statement: "As we close out 2021, a difficult year for many people, we know that there are those who are hurt and unhappy about Twitter posts by SDSU Dean Monica Casper.  I will always stand by the right to free speech, but I do not condone or agree with what she said.  I do not support actions that seek to divide us or undermine civic discourse for any reason."

60.    Dr. Corlett is informed and believes and thereon alleges that Casper took her action removing him from two of his three classes, in full or in part, because she regarded his lectures and class discussions in which racial epithets were spoken as an example of the "stench" about which she complained in her tweet.

61.    Casper's action removing Dr. Corlett from his classes was precisely the sort of deliberately divisive conduct against which SDSU President de la Torre had already warned her.

62.    At no time in making her decision to remove him from his classes did Casper follow SDSU Senate Policy and measure Dr. Corlett's classroom speech against the intellectual standards of the relevant academic and professional disciplines; nor did she reference the standards of the academic profession.

63.    After Casper's actions toward Dr. Corlett gained international media attention, two leading First Amendment advocacy groups – the Academic Freedom Alliance and the Foundation for Individual Rights and Expression ("FIRE") – wrote, respectively, to J. Luke Wood, SDSU's Vice President for Student Affairs and to President de la Torre setting forth why his classroom speech was protected under the First Amendment and principles of academic freedom.

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF; DEMAND FOR JURY TRIAL
Case No.  3:24-CV-00078-TWR-MMP

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

64.    FIRE also sent President de la Torre a letter signed by over 160 faculty from some of the finest universities around the world decrying the violation of Dr. Corlett's academic freedom.  The SDSU administration, including Defendants, ignored these academics who, unlike Casper and the complaining students, actually understood the relevant academic and professional disciplines and the standards of the academic profession.

65.    On April 11, 2022, Dr. Corlett submitted a Grievance Form Unit 3 asserting a statutory grievance regarding his removal from the two classes.  His grievance asserted that, since SDSU is a public university, Casper's actions violated his rights to free speech and academic freedom under the First Amendment.  His grievance demanded (1) his immediate reinstatement into the two classes and (2) SDSU's public acknowledgement that his classroom language that prompted his removal was protected speech under the First Amendment and under principles of academic freedom.

66.    On May 18, 2022, Defendant Tong (the SDSU President's designee to hear this grievance) conducted a Level I meeting with Dr. Corlett and his counsel. During that meeting, Dr. Corlett explained the factual background of this matter including the use-mention distinction in Philosophy, and the pedagogical relevance of his classroom language.

67.    On July 25, 2022, Defendant Tong issued a Level I Response denying Dr. Corlett's grievance.  The Response failed to discuss the factual background regarding what had occurred in the classrooms, the basis of Casper's decision, and the pedagogical relevance of Dr. Corlett's language that allegedly "offended" a few students.  Most significantly, the Response failed to even mention, much less apply, the standards (discussed above) by which SDSU commits itself to judge faculty speech.  Indeed, Tong's Response was nothing more than a rubber stamp of Casper's actions based on deference to a few "offended" students while ignoring

- 17 -

SDSU's express commitment to free speech and academic freedom as "core values" guaranteeing the right of faculty to be "free within the classroom to explore the widest possible range of viewpoints."

68.    Defendant Tong's Response further asserted that "academic freedom comes with responsibilities," and that these purported "responsibilities" are "based on shared values such as integrity, fairness, professional and social responsibility, equality of opportunity, confidentiality, honesty and openness, respect for self and others, and freedom and safety."

69.    Defendant Tong's vague and ambiguous limits and qualifications on academic freedom mentioned above were clearly contrary to both First Amendment law and SDSU Senate Policy on academic freedom. Furthermore, nowhere did Defendant Tong's Response state what exactly Dr. Corlett did wrong.

70.    Indeed, like Casper's emails removing Dr. Corlett from his classes, Defendant Tong's Response (1) did not dispute that Dr. Corlett's mention of certain epithets was pedagogically relevant to the subject matter of the courses and instead ignored the issue entirely, (2) failed to identify the academic basis on which to dispute the pedagogical relevance of this language, and (3) failed to assess Dr. Corlett's speech in light of the standards of the academic profession.  In short, Defendant Tong's response, like Casper's emails, was contrary to SDSU's written policies on freedom of expression and academic freedom.

71.    Similarly, at or around the same time that Dr. Corlett was removed from his classes in early March 2022, the University's then Vice President for Student Affairs and Campus Diversity, Luke Wood, was widely quoted in the media as stating that the removal was "about actions, not about freedom of expression."  However, at no time did Defendants or anyone else at the University explain what "actions" led to Dr. Corlett's removal *other than his classroom speech.*

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

72.    August 8, 2022, Dr. Corlett appealed Vice Provost Tong's decision.

73.    On January 31, 2023, SDSU held a hearing on his grievance before a Faculty Hearing Committee.  The hearing was Dr. Corlett's and the University's opportunity to present their arguments, witnesses and other evidence concerning the actions that Dean Casper had taken against him.

74.    At the grievance hearing, Dr. Corlett called the following three witnesses: Dorette Ponce (a female SDSU graduate student in Philosophy who had taken multiple courses with Dr. Corlett), Akacia Brillon (a female African-American student enrolled in a Ph.D. program in Philosophy at UCLA who had previously taken multiple courses with Dr. Corlett as an SDSU undergraduate); and Howard McGary, Ph.D. (an African American scholar in the area of racism and philosophy holding the position of Distinguished Emeritus Professor in the Department of Philosophy at Rutgers University).  Each of these witnesses testified in support of the pedagogical relevance of Dr. Corlett's statements in connection with the use-mention distinction in philosophy and that the language he employed was consistent with the applicable academic standards.  Ms. Ponce and Ms. Brillon also testified regarding their specific and positive observations and experiences as students in multiple classes taught by Dr. Corlett in which he employed the same lectures and classroom speech.

75.    In addition to calling the aforementioned witnesses at his grievance hearing, Dr. Corlett also submitted into evidence a letter from Dr. Nathan Salmon, Distinguished Professor, Department of Philosophy, University of California, Santa Barbara.  Among other things, Dr. Salmon explained the use-mention distinction, and that "it is impossible to talk about such expressions as racial slurs, or other offensive language, without mentioning the specific offending expressions."

76.    The University, on the other hand, offered no evidence at all disputing the pedagogical relevance of Dr. Corlett's language concerning the "n-word" or any

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

other statements he made in class.  Nor did the University call any witnesses or offer any evidence that Dr. Corlett's classroom speech was contrary to the applicable academic standards.  Nor did the University even call as witnesses any of the student(s) who purportedly complained about Dr. Corlett's speech or any other student from those classes.

77.    As noted above, Dean Casper removed Dr. Corlett from the two classes on March 1, 2022, the very same day on which two students complained about being offended at having heard him utter the "n-word" in class.  Indeed, just hours after those classes on March 1, 2022, Dean Casper "urgently" contacted Steve Barbone, the Chair of the Philosophy Department, advising him of her decision to remove Dr. Corlett from two of his three classes.  Chair Barbone responded that he hoped this would lead Dr. Corlett "to mend his ways."  Barbone, however, had never actually observed any of Dr. Corlett's classes; and his comment was completely contrary to his glowing evaluation of Dr. Corlett barely one year earlier.

78.    Despite the fact that Dean Casper's decision immediately followed the complaints by the students regarding hearing the "n-word" in Dr. Corlett's classes, at the grievance hearing he heard for the first time that his mention of the "n-word" was only one example of language about which some students had complained. However, that language as well was pedagogically relevant to the coursework and protected by the First Amendment and principles of academic freedom. The University, however, once again offered no testimony or other evidence that any of the statements made by Dr. Corlett in his classes was not pedagogically relevant or that it did not meet the applicable academic standards.

79.    Notwithstanding the evidence offered by Dr. Corlett that his classroom speech was protected by the First Amendment and by principles of academic

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

freedom, and the utter absence of any evidence to the contrary from the University, the Faculty Hearing Committee denied Dr. Corlett's grievance.

**E.      SDSU's Title IX Office Investigates Dr. Corlett's Protected Speech as "Harassment Based on Race and/or Gender."**

80.     On April 15, 2022, just weeks after Dean Casper summarily removed him from two of his three classes based on his protected classroom speech, Dr. Corlett received a Notice of Investigation from Gail Mendez, SDSU's Director, Center for Prevention of Harassment and Discrimination and Title IX Coordinator. The Notice of Investigation informed him that SDSU was investigating complaints by two students (the "complainants") that in the Spring 2022 semester he had "engaged in Harassment based on Race and/or Gender" and "whether the allegations constitute unprofessional conduct under Education Code Section 89535."

81.     The allegation of "Harassment because of Race" was asserted by student Joy Wade.  Ms. Wade complained that Dr. Corlett had used the "n-word" in his Philosophy 200 class (Critical Thinking and Composition) causing her emotional distress.

82.     The allegation of "Harassment because of Gender" was asserted by Ms. Wade and by student Lauren Payne.  They complained that Dr. Corlett had made references to "rape" and had used the words "pussy," "cunt," "bitch," and "pussy ass bitch" in his Philosophy 200 and Philosophy 512 (Political Philosophy) classes.

83.     Plaintiff is informed and believes that there were 28 students enrolled in the Philosophy 200 class and 14 enrolled in the Philosophy 512 class.

84.     SDSU retained the California Department of Justice ("DOJ") to investigate the harassment complaints.  `

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL
Case No.  3:24-CV-00078-TWR-MMP

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

85.    During the DOJ investigator's interview of Dr. Corlett, he denied ever saying the word "cunt" in class and explained that his references to the other epithets and his discussion regarding rape were always in the context of either the use-mention distinction or in the context of a class discussion concerning the ambiguities of certain words or in the context of other matters pedagogically relevant to the course subject matter.

86.    During the Philosophy 512 class (Political Philosophy), Dr. Corlett discussed in detail philosopher John Rawls' work, "A Theory of Justice," which was also the primary text for the course.  Dr. Corlett specifically addressed Rawls' discussion of the liberty right to freedom of speech and conscience.  In so doing, Dr. Corlett discussed, among other things, SDSU's administrative harassment of him in connection with his use of protected speech during his courses on Critical Thinking and Composition.  Dr. Corlett was illustrating the importance of Rawls' point in favor of freedom of expression, especially, Dr. Corlett added, in a university classroom concerning pedagogically relevant language.

87.    Dr. Corlett always begins the Critical Thinking and Composition course with lectures on logic and language and warns students about the importance of language and to always avoid vagueness and ambiguity.  He shows the students slides listing examples of ambiguous words and language including, among others, the word "bitch."  He then encourages students to, if they wish, provide examples of the different kinds of meaning s of "bitch," expressly reminding them to think of the word in gender inclusive ways to avoid sexism.  Dr. Corlett points out that there was a time when the word was often used only in a gendered and sexist way but is now used in myriad ways, hence its ambiguity.  He followed this same pedagogy in discussion of the illustration in the classes taken by the Complainants.

88.    At Dr. Corlett's invitation, the Critical Thinking and Composition students were encouraged to voluntarily participate in the classroom discussion by

offering their suggestions as to the meanings or uses of the word "bitch." Their suggestions included "pussy bitch," "rich bitch," "ugly bitch," and perhaps 20-30 more. Dr. Corlett's pedagogy involved him repeating aloud the students' suggestions so that all students could hear what other students were contributing, writing them on the dry erase board, and noting the word's various modifiers to indicate just how ambiguous "bitch" is and why one ought to *avoid* ambiguity in language. The male and female students enjoyed and laughed during the class discussion while learning about ambiguity and why and how to avoid it.

89. In his employment of the illustration from his Critical Thinking and Composition course with his Philosophy 512 students, Dr. Corlett also discussed with his Philosophy 512 students the "use-mention" distinction and how it applied to words like "bitch" or "pussy" or "pussy bitch." He never once "used" those words but (like his mention of the n-word in his teaching of racist versus racial language) only "mentioned" them in the context of the ambiguity of language and the SDSU administration's elevation of a student's offense at hearing such words over the rights of the faculty and students to mention them in a context pedagogically germane to the coursework.

90. Dr. Corlett never directed these words or any epithet at any student in classes or condone it on the part of anyone else; nor did any student, including the two complainants, accuse him of doing so.

91. Dr. Corlett never used any epithet in a sexual or gendered context or to refer to or to denigrate women; nor did any student, including the two complainants, accuse him of doing so.

92. Dr. Corlett never uttered any of these epithets because of the gender or race of the complainants or of any other student in class; nor did any student, including the two complainants, accuse him of doing so.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

93.    The race or gender of the complainants or of any other student in class was not a substantial motivating reason for Dr. Corlett's utterance of these epithets; nor did any student, including the two complainants, allege that their race or gender was a substantial motivating reason behind Dr. Corlett's references to these words.

94.    The race or gender of the complainants or of any other student in class was never *any* motivating reason, substantial or otherwise, for Dr. Corlett's utterance of these epithets; nor did any student, including the two complainants, allege otherwise.

95.    During her investigation and in reaching her findings, the DOJ investigator never applied SDSU's own standards regarding academic freedom, i.e., she never inquired into whether, nor produced any evidence that, Dr. Corlett's utterance of these epithets in class was contrary to the intellectual standards of the relevant academic and professional disciplines or violated the standard of the academic profession.

96.    The undergraduate complainants in the classes were unqualified to judge whether Dr. Corlett's utterance of these epithets in class was contrary to the intellectual standards of relevant academic and professional disciplines or violated the standard of the academic profession.  Their complaints were based on nothing more than that they were allegedly offended by hearing these words spoken in class by Dr. Corlett.

97.    The *only* evidence adduced during the DOJ investigator's investigation regarding whether Dr. Corlett's utterance of these epithets in class was contrary to the intellectual standards of relevant academic and professional disciplines or violated the standard of the academic profession was the unrebutted testimony of Dr. Corlett himself.  Dr. Corlett explained that his references to these words were pedagogically relevant to, among other things, the use-mention distinction and the ambiguity of language.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

**F.     The Department of Justice Report's Findings Failed to Satisfy the CSU Policy Prohibiting Harassment (Article VII.A.2).**

98.    The DOJ investigator released her Confidential Report of Investigation ("DOJ Report") on December 15, 2022.  The report reached the following findings:

(1)    The allegation that Dr. Corlett had engaged in discrimination based on gender was **not substantiated**.

(2)    The allegation that Dr. Corlett had engaged in harassment based on race/ethnicity was **not substantiated**.

(3)    The allegation that Dr. Corlett had engaged in sexual harassment was **not substantiated**.

(4)    Dr. Corlett **did not engage in unprofessional conduct** within the meaning of California Education Code section 89535.

99.    Although the investigation cleared Dr. Corlett of the above charges, it nonetheless found that the allegation that he had engaged in "harassment" based on gender was substantiated.  The sole basis for this conclusion was the DOJ investigator's finding that Dr. Corlett made statements in class that included the words "pussy" and "bitch" in a derogatory manner.

100.    The DOJ Report rejected the claim that Dr. Corlett had used the word "cunt" in class.

101.    The DOJ Report rejected the complaints that Dr. Corlett had improperly referred to "rape" in class and, to the contrary, found that that he discussed the subject in an academic context.

102.    The DOJ Report also found that Dr. Corlett's references to the "n-word" were made in an academic context.

103.    The only remaining words that purportedly offended the complainants were "pussy" and "bitch."

104.  The DOJ Report, however, conceded that at no time did Dr. Corlett direct the words "pussy" or "bitch" at the complainants or toward anyone in class nor use those words in a sexual or gendered context or manner.

105.  The DOJ Report also found that Dr. Corlett had not used the words "pussy" or "bitch" to negatively describe or refer to the female gender.

106.  The DOJ Report did not adduce any evidence that Dr. Corlett had uttered these words "because of" the complainants' protected status as females. Nor did the report offer any evidence that the complainants' protected status was a "substantial motivating reason" or indeed that their protected status was any reason at all for Dr. Corlett having spoken these words.

107.  The DOJ Report did not find that the complainants had even alleged that Dr. Corlett had uttered these words because of their protected status as females.

108.  The DOJ Report noted Dr. Corlett's testimony that he had referenced the word "pussy" in the context of describing a person who is "not courageous" and that his discussion of the word "bitch" was as "the most ambiguous word in the English language."

109.  Dr. Corlett testified that his classroom speech referring to these and other words that might be regarded as epithets was consistent with the relevant academic and professional disciplines and the standard of the academic profession. The DOJ Report offered no evidence contradicting that testimony other than that the complainants were purportedly offended by hearing those words.  Thus, the *only evidence* in the record as to whether the statement of these words met the applicable standards of the profession was Dr. Corlett's testimony that they did.

110.  Rather than offer any evidence that Dr. Corlett used these words "because of" the complainants' gender, or that their gender was a "substantial motivation" for his use of the words, the DOJ Report simply found that because those words can sometimes be used negatively toward women, and because he

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

stated the words in a derogatory context (while conceding that he never used them in a sexual or gendered context), he nonetheless engaged in gender-based harassment.

111.  The DOJ investigator's finding so distorted the plain language of the definition of "harassment" that it essentially allowed any student in Dr. Corlett's class to subjectively decide when a particular word offended them and afforded them the right to exercise a "heckler's veto" over his classroom speech.

112.  The DOJ Report's findings and conclusions were, therefore, directly contrary to the plain language of the CSU Policy Prohibiting Harassment (Article VII.A.2).

113.  The DOJ Report's findings and conclusions, therefore, violated Dr. Corlett's rights to free speech and academic freedom, and constituted (1) retaliation for his exercise of that right, under the First and Fourteenth Amendments of the United States Constitution and his right to academic freedom under CSU Policy and SDSU's Academic Senate Rules, and (2) interpreted the CSU Nondiscrimination Policy's definition of "Harassment" in such a way as to allow enforcement on an arbitrary and ad hoc basis with an individual student permitted to exercise a heckler's veto based on her subjective view of Dr. Corlett's language.

114.  Furthermore, CSU's Policy Prohibiting Harassment states in essence that harassment may occur if (1) submitting to verbal conduct is a basis for decisions that affect or threaten the complainant's academic status or progress or access to educational services and benefits at CSU or (2) "the conduct is sufficiently severe or pervasive so that its effect, whether intended or not, could be considered by a reasonable person under similar circumstances and with similar identities, and is in fact considered by the Complainant as creating an intimidating, hostile or offensive . . . educational environment that denies or substantially limits

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

an individual's ability to participate in or benefit from . . . educational, services, activities, or other privileges provided by the CSU."

115.  Having conceded that Dr. Corlett's references to the "n-word" and discussion of "rape" were academically relevant and having flatly rejected as unbelievable the accusation that he ever used the word "cunt," the *only* remaining words at issue were his references to the words "pussy" and "bitch" or some linguistic combination thereof.

116.  In short, the two complainants presented a long list of complaints regarding Dr. Corlett's words and topics, most of which were rejected by the DOJ investigator as either academically relevant or simply unbelievable.  Nowhere does the Report offer evidence that simply hearing the remaining words "pussy" and "bitch" (not directed at either of them or stated in a sexual context or in a negative manner toward women) would  have even caused them to complain much less to have felt reasonably "threatened" in their "academic status or progress" or to have reasonably constituted such an "intimidating, hostile, or offensive" environment that substantially limited their ability to participate in or benefit from their education at CSU.

117.  The idea that hearing these words – and just these words – would have had the impact defined as "harassment" on adult university students is preposterous.  Nonetheless, the DOJ investigator carved these words out of the rest of the complainants' complaints and decided on her own, without supporting evidence from the complainants or from anyone else, that simply hearing them (without the words being directed *at* them or being used in a sexual or gendered context) was still sufficient to meet CSU's definition of harassment.

118.  Plaintiff is informed and believes and thereon alleges that the two complainants brought their complaints at the urging, either directly or indirectly, of

one or more of the Defendants, the details of which will be proved through discovery.

119. On January 24, 2023, SDSU's Title IX office issued a Notice of Investigation Outcome adopting the DOJ investigator's findings.

**G.      Dr. Corlett Appeals the DOJ Report's Findings to the Office of the Chancellor.**

120. On February 7, 2023, Dr. Corlett filed an appeal with the California State University Office of the Chancellor. The basis for the appeal was that "There was no reasonable basis for the findings or conclusions that resulted in the investigation outcome."

121. There was no reasonable basis for the findings or conclusions that Dr. Corlett violated CSU's Nondiscrimination Policy because: (1) Dr. Corlett's references to the epithets in question did not and could not constitute harassment since they were not made "because of" nor were "substantially motivated by" the complainants' gender-based protected status. Moreover, even the complainants admitted that the words were *not directed at them* and *were not used in a sexual context*. (2) Dr. Corlett's reference to the epithets in his classroom lectures and discussions were pedagogically relevant to his teaching of the courses and, therefore, constituted protected speech under the First Amendment and under SDSU's Senate Policy protecting Academic Freedom.

122. On June 20, 2023, the Office of the Chancellor rejected Dr. Corlett's appeal finding that there was "substantial evidence" that he violated the Nondiscrimination Policy and committed gender-based harassment toward the complainants by simply stating the words "pussy" and "bitch" in a derogatory manner, which the Complainants found offensive.

123. There are at least four common definitions of the word "pussy," as follows: (1) cat (noun); (2) vulva (noun); (3) full of or resembling pus (adjective);

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

and (4) a weak or cowardly man or boy (noun).  The word history reflects that it has been used regarding the first two definitions since 1699, the third definition since 1888; and the fourth definition since 1942.  www.merriam-webster.com.

124.  There are at least five common definitions of the word "bitch," as follows: (1) female of dog or other carnivorous mammal (noun); (2) a malicious, spiteful or overbearing woman, or used as a generalized term of disparagement of women (noun); (3) something that is very difficult, objectionable or unpleasant (noun); (4) complaint (noun); and (5) complain, spoil, botch, cheat, double-cross (verb).  The word has been in use for over a thousand years.  www.merriam-webster.com.

125.  Dr. Corlett testified in his DOJ interview (as confirmed in the DOJ Report) that his reference to the word "pussy" was with respect to the fourth definition, i.e., a weak or cowardly man or boy.  In addition, as explained above, the term "pussy" came up during a class discussion in which students offered a long list of modifiers of the word "bitch" to reflect that word's ambiguity.

126.  Dr. Corlett testified in his DOJ interview (as confirmed in the DOJ Report) that his reference to the word "bitch" was in the context of it being one of the most ambiguous words in the English language.

127.  The DOJ investigation adduced no evidence that Dr. Corlett ever uttered the word "pussy" to mean anything other than regarding a weak or cowardly man or boy or as suggested by his students as a modifier for the word "bitch" in the context of the latter word's ambiguity.

128.  Despite the absence of any evidence disputing Dr. Corlett's explanation of how he spoke these words, the Office of the Chancellor adopted the DOJ Report's findings and concluded that because a meaning of the word "pussy" and a meaning of the word "bitch" can have a "connection to the female gender,"

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

that alone suffices as "substantial evidence" that Dr. Corlett's "use of the term was substantially motivated by Complainants' gender."

129.  The Office of the Chancellor further concluded, based solely upon the interviews of a few of the undergraduate students in these classes who were utterly unqualified to offer opinions regarding the academic standards of the profession, that there was sufficient evidence that Dr. Corlett's purported "use" of these "gender slurs" was not relevant to the courses.

130.  Of even greater concern is that the Office of the Chancellor went far beyond the findings of the DOJ in concluding that Dr. Corlett violated CSU's Nondiscrimination Policy.  For example, the Office of the Chancellor noted that a student (not one of the complainants) had told the DOJ investigator that Dr. Corlett had created a "hostile environment" for females by using the word "rape" as "a metaphor to criticize the education system and other institutions."  The Chancellor's decision also noted that a student had expressed concerns that Dr. Corlett had criticized the #MeToo movement and the handling of the Bill Cosby rape case during the Philosophy 512 class.  This was a "Political Philosophy" class in which these discussions and Dr. Corlett's observations were clearly matters of public concern that were pedagogically relevant to the course, and well within the latitude afforded him regarding how to teach the material, irrespective of the fact that they made a few students feel uncomfortable.

131.  Thus, despite the fact that even the DOJ investigator concluded that Dr. Corlett's comments referencing rape and similar topics were pedagogically relevant, the Officer of the Chancellor nonetheless determined, based solely on the subjective feelings of a few undergraduate students, that he must have used the word in a non-academic context.

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF; DEMAND FOR JURY TRIAL
Case No.  3:24-CV-00078-TWR-MMP

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

132.  Having rejected Dr. Corlett's appeal, the Office of the Chancellor concluded by stating that it considered the matter "closed" and took no further action.

**H.     Defendant Tong Issues a Disciplinary Sanction Suspending Dr. Corlett for One Semester Without Pay.**

133.  Notwithstanding the Office of the Chancellor's determination that the matter was ended, it was anything but "closed" for SDSU's Interim Provost and Senior Vice President – Defendant Tong.

134.  On August 23, 2023, Defendant Tong issued a Notice of Pending Disciplinary Action to Dr. Corlett.  The Notice advised Dr. Corlett that he would be subject to a one-semester suspension without pay on the grounds that "In Spring 2022 semester you used gender slurs, including 'pussy' and 'bitch,' in a derogatory manner while teaching Philosophy 512 (Political Philosophy)."

135.  Defendant Tong asserted the following Reasons for Discipline:

(1)     Violation of the CSU Nondiscrimination Policy through gender-based harassment by "using" the words "pussy" and "bitch" in the Philosophy 200 and Philosophy 512 courses and the word "rape" in non-academic contexts.

(2)     By violating the Nondiscrimination Policy through gender-based harassment, Dr. Corlett also violated University Senate Policy which requires instructors to "maintain an atmosphere conducive to learning" and to "maintain and promote a policy of nondiscrimination on the basis of …gender identity and expression…"

(3)     Violation of California Education Code § 89535(b) ("unprofessional conduct") and § 89535(f) ("failure or refusal to perform the normal and reasonable duties of your position").

136.  On September 17, 2023, Dr. Corlett sought administrative review of Defendant Tong's Notice through the Office of the Provost's Reviewing Officer,

Casie Martinez.  Dr. Corlett's grounds for review were that the plain language of the Nondiscrimination Policy conclusively demonstrates that he did not engage in harassment based on gender, Tong's Notice failed to apply the appropriate standard to Dr. Corlett's speech mandated by University Senate Policy, and Dr. Corlett's speech at issue was protected under the First Amendment.

137.  On September 23, 2023, Martinez issued a letter to Defendant Tong recommending that he reject Dr. Corlett's administrative review and that the proposed disciplinary action be sustained.

138.  On September 26, 2023, Defendant Tong issued his Final Decision Regarding Pending Disciplinary Action affirming the disciplinary action of a one-semester suspension without pay commencing on January 16, 2024.

139.  In reaching his decision, at no time did Defendant Tong ever personally observe any of Dr. Corlett's classes.

140.  Defendant Tong is not a member of the faculty of the Department of Philosophy at CSUSD; nor, Plaintiff is informed and believes, does he have any professional background in Philosophy in general or specifically in the courses in which the complainants were students.

141.  In reaching his decision, at no time did Defendant Tong consult with any qualified professional in Dr. Corlett's academic profession regarding his use of language in the classes in question.

142.  In reaching his decision, at no time did Defendant Tong measure Dr. Corlett's classroom conduct or language against the standards of the academic profession.

143.  In reaching his decision, Defendant Tong knowingly ignored or misapplied the University Senate Policy on Academic Freedom.

144.  In reaching his decision, defendant Tong knowingly ignored or misapplied the University Senate Policy on freedom of speech.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

145.  Defendant Tong reached his decision despite knowing that Dr. Corlett's classroom speech utterly failed to satisfy the definition of "harassment" contained in the plain language of the CSU Nondiscrimination Policy.

146.  In reaching his decision, Defendant Tong knowingly ignored the fact that the DOJ investigator found in Dr. Corlett's favor on virtually all the complainants' complaints against him.

147.  In reaching his decision, Defendant Tong knowingly ignored the fact that the only evidence regarding whether Dr. Corlett's language met the standard of the academic profession was Dr. Corlett's testimony that established he met the applicable professional standard.

148.  In reaching his decision, Defendant Tong knowingly ignored the fact that the investigation did not include any testimony or other evidence from any qualified member of the academic profession contradicting the testimony of Dr. Corlett.

149.  Defendant Tong improperly determined that Dr. Corlett was guilty of harassment based simply on the offense taken by two undergraduate complainants out of the more than forty students enrolled in these classes.

## FIRST CAUSE OF ACTION

**Violation of First and Fourteenth Amendments: Retaliation (Against All Defendants)**

**(42 U.S.C. § 1983)**

150.  Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 149, as if set forth fully herein.

151.  Plaintiff engaged in constitutionally protected classroom speech regarding the subject classes and purported complaints.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

152.  Defendants, without furthering any compelling state interest, have subjected Dr. Corlett to adverse employment actions and discipline based on his protected classroom speech.  Defendants, acting under color of state law, have retaliated against Plaintiff by, among other things, removing him from his classes, preventing him from performing his fundamental job duties, suspending him without pay, threatening him with further discipline, affording his students a heckler's veto over his classroom speech, and chilling his protected speech.

153.  Defendants, including Defendants Tong and Casper, knew or reasonably should have known that their actions violated Plaintiff's clearly established First Amendment right to freedom of speech.

154.  Pursuant to 28 U.S.C. §2201, Plaintiff is entitled to a declaration that Defendants Monica Casper, William Tong, and DOES 1-50 violated his rights to free speech and academic freedom under the First Amendment by removing him from his classes on March 1, 2022 and by suspending him without pay for one semester in 2024.

155.  Pursuant to 28 U.S.C. § 1343(a), Plaintiff is entitled to injunctive relief precluding Defendant Tong from further violating Plaintiff's rights to free speech under the First Amendment and to academic freedom under the First Amendment and SDSU Policy.

## SECOND CAUSE OF ACTION

**Violation of the First and Fourteenth Amendments: SDSU Non-Discrimination Policy As Applied to Plaintiff's Protected Speech (Against Defendants William Tong and DOES 1-50)**

**(42 U.S.C. § 1983)**

156.  Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 155, as if set forth fully herein.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

157.  Defendant Tong's application of SDSU's Non-Discrimination Policy, including but not limited to its definition of "harassment," to Plaintiff was unconstitutional because it failed to apply the policy to Plaintiff's protected speech in a manner consistent with the plain meaning of the Policy's language in violation of Plaintiff's First Amendment rights.

158.  Defendant Tong, acting under color of state law, exercised unbridled discretion to determine whether harassment had occurred based on ad hoc and subjective criteria regarding Plaintiff's classroom speech without notice to Plaintiff, that were unknown to Plaintiff, and of which Plaintiff could not have been aware.

159.  Defendant Tong applied the Non-Discrimination Policy in a way that ignored the criteria established by SDSU regarding its commitment to the First Amendment and principles of free speech as well as regarding academic freedom.

160.  The aforementioned conduct by Tong constituted a denial of Plaintiff's clearly established First Amendment rights.

161.  Because of Defendant Tong's actions, Plaintiff has suffered, and continues to suffer, economic injury, emotional distress, damage to reputation, and irreparable harm.

162.  Pursuant to 28 U.S.C. §2201, Plaintiff is entitled to a declaration that Defendant Tong, and DOES 1-50 violated his rights to free speech and academic freedom under the First Amendment by suspending him without pay for one semester in 2024.

163.  Pursuant to 28 U.S.C. § 1343(a), Plaintiff is entitled to injunctive relief precluding Defendant Tong from further violating Plaintiff's rights to free speech under the First Amendment and to academic freedom under the First Amendment and SDSU Policy.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

# **THIRD CAUSE OF ACTION**

## **Declaratory Relief (Against All Defendants)**

## **(28 U.S.C. § 2201)**

164.  Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 163, as if set forth fully herein.

165.  At all times relevant to this action, Plaintiff was employed full time as a tenured full Professor in the Department of Philosophy at SDSU.  As such, his rights to freedom of speech and academic freedom in the classroom were clearly established and guaranteed by the First Amendment to the U.S. Constitution and by CSU Senate Policy.

166.  Defendants knew or reasonably should have known that their conduct violated Plaintiff's rights to freedom of speech and academic freedom under the CSU Senate Policy by, among other things, disciplining him for using pedagogically relevant speech during his lectures and class discussions based on the purported subjective offense to certain words on the part of a few undergraduate students.

167.  Defendants knew or reasonably should have known that their conduct violated Plaintiff's rights to freedom of speech an academic freedom under the CSU Senate Policy by, among other things, failing at every step of the investigatory and disciplinary process to apply the appropriate standard, i.e., measuring Plaintiff's speech against the intellectual standards of relevant academic and professional disciplines and by reference to the standard of the academic profession.

168.  Pursuant to 28 U.S.C. §2201, Plaintiff is entitled to a declaration that Defendants Monica Casper, William Tong, and DOES 1-50 violated his rights to free speech and academic freedom under the First Amendment.

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL
Case No.  3:24-CV-00078-TWR-MMP

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff J. Angelo Corlett, Ph.D. respectfully requests that the Court enter judgement against Defendants William Tong and Monica Casper, and DOES 1-50, and provide him with the following relief:

1.     A declaratory judgment stating that Defendants' disciplinary action and punishment, including his removal from his classes on March 1, 2022 and his suspension without pay, violated his rights to free speech and academic freedom, and that Defendant Tong's order suspending Plaintiff without pay for one semester violated his rights to free speech and academic freedom under the First and Fourteenth Amendments to the United States Constitution;

2.     A preliminary injunction requiring Defendant Tong to refrain from violating Plaintiff's right to free speech under the First Amendment based on his classroom speech;

3.     Plaintiff's reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988 and other applicable law;

4.     All other relief to which Plaintiff may be entitled; and

5.     That this Court retain jurisdiction of this matter for purposes of enforcing this Court's orders.

DATED: October 10, 2024          LEADER BERKON COLAO & SILVERSTEIN LLP


By: /s/ Arthur I. Willner
Arthur I. Willner, SBN 118480
awillner@leaderberkon.com
Attorneys for Plaintiff J. ANGELO CORLETT, PH.D.

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

## JURY TRIAL

Plaintiff demands a trial by jury on all claims triable by jury in this cause of action.

DATED: October 11, 2024        LEADER BERKON COLAO &
                               SILVERSTEIN LLP


                          By:  /s/ Arthur I. Willner
                               Arthur I. Willner, SBN 118480
                               awillner@leaderberkon.com
                               Attorneys for Plaintiff ANGELO CORLETT

Leader Berkon Colao & Silverstein LLP
Attorneys at Law

PLAINTIFF'S FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF; DEMAND FOR JURY TRIAL
Case No.  3:24-CV-00078-TWR-MMP