UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

J. ANGELO CORLETT, Ph.D., an individual,

Plaintiff,

v.

WILLIAM TONG, in his individual and official capacities; MONICA J. CASPER, in her individual and official capacities; and DOES 1 through 50, inclusive,

Defendants.

Case No.: 24-CV-78 TWR (MMP)

**ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND (2) DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING AS MOOT DEFENDANTS' *DAUBERT* MOTION**

(ECF Nos. 52, 53, 61)

Presently before the Court are Defendants William Tong and Monica J. Casper's Motions to Exclude Testimony and Report of Nathan Salmon, Ph.D. ("*Daubert* Mot.," ECF No. 52) and for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Defs.' MSJ," ECF No. 53), as well as Plaintiff J. Angelo Corlett, Ph.D.'s Consolidated Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment and Daubert Motion ("Pl.'s X-MSJ," ECF No. 61), Defendants' (1) Opposition to Plaintiff's Cross-Motion for Summary Judgment and (2) Reply in Support of Motion for Summary Judgment (ECF No. 64), and Plaintiff's Reply in Support of His Motion for Summary Judgment (ECF No. 68). The Court held a hearing on April 16, 2026. (*See* ECF

No. 74.) Having carefully considered the record, the Parties' arguments, and the relevant law, the Court **GRANTS** Defendant's Motion for Summary Judgment, **DENIES** Plaintiff's Cross-Motion for Summary Judgment, and **DENIES AS MOOT** Defendants' *Daubert* Motion.

## BACKGROUND

### I. Undisputed Material Facts

The Court and the Parties are familiar with the facts of this case and have agreed to a set of 29 undisputed material facts. (*See* ECF No. 72 ("Jt. Stmt.") ¶¶ 1–29.) Defendants have introduced 59 additional facts, (*see id.* ¶¶ 30–88), and Plaintiff an additional 24, (*see id.* ¶¶ 89–113), the majority of which are undisputed but contested as to their materiality. (*See id.* ¶¶ 30–44, 52–56, 58, 61, 62, 69–73, 75–81, 83–88, 90, 96, 99, 108.) The Court incorporates by reference these undisputed facts in their entirety.

To provide context, the Court also provides a recitation of undisputed facts material to its analysis below:[1]

#### *A. The Parties*

"Plaintiff J. Angelo Corlett, Ph.D. is a tenured full Professor and has been employed on the faculty of San Diego State University's ("SDSU") Department of Philosophy for over twenty-five years." (Jt. Stmt. ¶ 1.) His "areas of specialty include, among others, ethics, social and political philosophy, academic freedom, and the philosophy of law including issues pertaining to racism, justice and the philosophical analyses of racialized and sexualized language," (*id.* ¶ 89), and he is a strong proponent of academic freedom for faculty. (*See, e.g.*, *id.* ¶¶ 31, 41.) Although Plaintiff received a number of teaching awards, (*see id.* ¶ 90), he also attracted a number of student complaints. (*See, e.g.*, *id.* ¶¶ 33, 39–40, 42–44.) This included complaints of Plaintiff's mention of the "n-word" in class,

/ / /

---

[1] To the extent either Party has objected to these specific facts as immaterial or disputed, the Court **OVERRULES** those objections.

(*see, e.g.*, *id.* ¶¶ 45, 47, 48), and other "unnecessarily . . . explicit language," (*see id.* ¶ 46), including "jok[es]" about rape and bestiality. (*See id.* ¶¶ 49–54.)

During the times relevant to this action, Defendant Casper "served as Dean of SDSU's College of Arts and Letters[,]" (*id.* ¶ 2), and Defendant Tong served as Vice Provost. (*See id.* ¶ 29.) Dean Casper joined SDSU as Dean and as a Professor of Sociology in August 2020, (*see* ECF No. 53-14 ("Casper Decl.") ¶ 3), and among her various responsibilities as Dean were personnel, student success, and curriculum. (*See id.* ¶ 5.)

***B. Professor Corlett's March 1, 2022 Reassignment***

"In Spring 2022, Corlett taught Philosophy 200, 'Critical Thinking and Composition[,]'" (Jt. Stmt. ¶ 9), and "Philosophy 328 – 'Philosophy, Racism & Justice,' a general education course." (*Id.* ¶ 12.) "Most enrollees in . . . [these] course[s] were freshmen or sophomores." (*See id.* ¶ 58; *see also* ECF No. 53-5 at 1–28 ("Casper Dep.") at 29:11–14.) During two class sessions for Philosophy 200 on February 24, 2022, and March 1, 2022, (*see id.* ¶ 59; *see also id.* ¶¶ 23–24), "Corlett . . . spoke the word 'n*****' . . . to teach the 'use-mention distinction[,]'" (*id.* ¶ 13), which "is a basic concept of analytical philosophy." (*Id.* ¶ 21.)

Specifically, on February 24, 2022, Plaintiff spent approximately half of a seventy-five-minute lecture on the use-mention distinction, during which time he mentioned the unexpurgated "n-word" "probably a total of not more than ten" times. (*See* ECF No. 53-3 at 105–226 ("Defs.' Corlett Dep.") at 153:7–156:2.) Philosophy 200 reconvened on March 1, 2022, (*see id.* at 157:23–25), during which time Plaintiff spent the entire seventy-five-minute class on the use-mention distinction, (*see id.* at 159:10–12), and again mentioned the unexpurgated "n-word" "no more than 10" times. (*See id.* at 161:18–25.) Although Plaintiff did not recall any students raising concerns about his mention of the unexpurgated "n-word" during either lesson, (*see id.* at 157:10–12 (February 24, 2022), 161:1–164:19 (March 1, 2022)), he also testified that, at least on March 1, 2022, "[s]omebody could have said something and [he] may not have heard it." (*See id.* at 164:11–12.)

On March 1, 2022, after Dean Casper investigated the incident, (*see* Jt. Stmt. ¶¶ 14–16, 63–74; Casper Decl. ¶¶ 10–19); *see also infra* Section I.C, "Professor Corlett received two emails from Dean Monica Casper advising [him] that she was removing him from teaching Philosophy 200 and Philosophy 328 . . . because, according to her, there had been 'numerous student complaints' and 'it is clear you are not effective in the course.'" (Jt. Stmt. ¶ 100; *see also id.* ¶ 16.) Dean Casper "did not remove Professor Corlett from his graduate Philosophy 512 course in Spring 2022." (Casper Decl. ¶ 20.) Further, "[a]fter Casper removed Corlett's undergraduate teaching assignments, he remained a faculty member and retained his same title with full pay and full benefits," (Jt. Stmt. ¶ 76), and "remained free to conduct whatever research and writing he wished, including on controversial topics." (*Id.* ¶ 77.)

***C. Dean Casper's Investigation***

Because Plaintiff's surviving claims challenge Dean Casper's March 1, 2022 reassignment of him from Philosophy 200 and 328, (*see generally* FAC; Second Dismissal Order), the Court provides the undisputed facts as Dean Casper reasonably believed them to be at the time of her decision. *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 677 (1994) (directing courts to "look to the facts as the employer *reasonably* found them to be" (emphasis in original)).

*1. Prior Complaints Regarding Plaintiff*

As an initial matter, Dean Casper's decision was not made in a vacuum because, as Dean of SDSU's College of Arts and Letters since August 2020, (*see* Casper Decl. ¶ 3), she was familiar with Plaintiff's "prior history, which included prior complaints by students, and prior efforts by administrators to address disrespectful and unnecessarily provocative conduct by Dr. Corlett, including unnecessary references to rape and sexual assault, (*see id.* ¶ 17; *see also* Jt. Stmt. ¶¶ 74(e), (g)), and "concerns raised by faculty members too, including a complaint of a hostile work environment." (Casper Decl. ¶ 18; *see also* Jt. Stmt. ¶ 74(f).)

/ / /

"Addressing student complaints about professors was a critical part of [Dean Casper's] work, and . . . [she] received frequent communications about student complaints regarding Dr. Corlett." (Casper Decl. ¶ 6.) "In fact, [she] received substantially more student complaints about Dr. Corlett than [she] received about all other Arts [&] Letters faculty combined." (*Id.*) "In addition to learning of student complaints about Dr. Corlett, [she] learned that students withdrew from Dr. Corlett's courses in high numbers." (*Id.* ¶ 7.)

Specifically, "[i]n March of 2021, [SDSU] had issues with [Plaintiff] using language in the class, including rape jokes and other memes that were traumatizing to some people in the classroom." (Casper Dep. at 34:6–9; *see also id.* at 45:4–46:16.) "In these instances, students were concerned about his use of highly charged racialized language, including of the N word, hard R, multiple times." (*Id.* at 34:9–12.)

In fall of 2021, Dr. Casper received approximately five student complaints regarding Plaintiff. (*See* Casper Dep. at 25:16–22; *see also* Casper Decl. ¶¶ 8(a)–(f).) On October 21, 2021, for example, Dean Casper received emailed complaints from four of Plaintiff's Philosophy 328 students. (*See* ECF No. 53-7 at 6–9.) "Student 22" wrote: "I understand, that this course is about racism and racist language, but Professor Corlett has made some inappropriate comments about gay people and has consistently used the N word, especially as of recently when talking about offensiphobia." (*See id.* at 6.) Similarly, "Student 24" noted:

> [M]any of my peers and I have problems with . . . the language [Dr. Corlett] uses while teaching the class. There's a lot of language that is really unacceptable to my peers and I. I understand that this class is to teach about racism and justice, however, I do not think it is necessary for him to use the explicit language that he mentions. For reference, he uses a lot of derogatory language that is used against others of different races (which I will not be using specifics as it makes me uncomfortable to even say).

(*Id.* at 7.) "Student 26" reported: "[Plaintiff] says very unpleasant things and words during class. . . . He offended me when he told us that 'immigrants should go back where they belong.' I am gay, from a family of immigrants, and I do not feel safe in that class." (*Id.* at 9.)

The complaints did not come only from students in Plaintiff's lower-division courses. On November 8, 2021, Dean Casper was forwarded a November 7, 2021 email from a Philosophy of Law 510 student, who complained that "[Plaintiff's] comments have made me uncomfortable [o]n more than one occasion. . . . For example, he makes 'jokes' about rape during his teachings[.]" (*Id.* at 19.) The student also "[a]ttached . . . some screen shots of [Plaintiff's] inappropriate comments regarding transgender individuals amongst other things." (*Id.*)

These fall 2021 student complaints led to an "intervention" on November 17, 2021, at which time Dr. Ronnee Schreiber, then-Senior Associate Dean of the College of Arts and Letters, and Dr. Mounah Abdel-Samad, SDSU's California Faculty Association ("CFA") representative, met with Plaintiff regarding how "some of [Plaintiff's] language wasn't allowing [his] students to learn effectively." (*See* Casper Dep. at 36:7–23, 52:11–53:13.) Although Dean Casper did not attend the meeting, (*see id.* at 53:14–15), she was copied on a November 22, 2021 email sent by Dean Schreiber to Plaintiff memorializing several agreements reached during the meeting regarding "student concerns related to PHLI 328 and 510," including that "[d]iscussions of rape or sexual assault w[ould] be brought up in relevant contexts like teaching about crime and punishment" and that "off-the-cuff references to the subject [we]re best avoided to help create a better learning environment for students." (*See id.* at 53:16–54:6; ECF No. 53-7 at 24.)

Dean Casper was also aware that there had been "prior efforts by administrators to address disrespectful and unnecessarily provocative conduct by Dr. Corlett, including unnecessary references to rape and sexual assault," (*see* Casper Decl. ¶ 17), and that Dr. Barbone had "talked with Professor Corlett about his teaching and the ineffectiveness." (*See* Casper Dep. at 38:10–12.) Plaintiff, however, was "not . . . receptive to these efforts." (*See* Casper Decl. ¶ 9.)

Complaints regarding Plaintiff's teaching in fall 2021 continued even after the end of the term. In January 2022, for example, Dean Casper was copied on an email to "Student

/ / /

139," who requested a retroactive withdrawal from Plaintiff's fall 2021 Philosophy 510 course on the grounds that

> [Plaintiff] said the word "bitch" at least 20 times per class and freely used the n-word with a hard r as he saw fit. Now, there is simply no excuse for a professor saying that word unless maybe s/he is teaching a class about the atrocious history of slavery. Even then, a professor should probably not say it. However, Corlett used the word freely at least 4 times in our class.

(*See* ECF No. 53-7 at 33.)

Further, the complaints Dean Casper received about Plaintiff were not only from students. Indeed, Dean Casper "was aware of . . . concerns [about Plaintiff] raised by faculty members too, including a complaint of a hostile work environment, where an untenured faculty member of color had previously raised disturbing concerns about Dr. Corlett and asked to be moved out of his department, which [Dean Casper] approved and facilitated." (Casper Decl. ¶ 18.)

*2. Events of March 1, 2022*

It was against this backdrop that Dean Casper was confronted with the student complaints that initiated the instant lawsuit. Specifically, in March 2022, Dean Casper learned of two email complaints regarding Plaintiff's mention of the unexpurgated "n-word" in his lecture(s), one sent to a faculty member, and another through SDSU's student rights system. (*See* Casper Dep. at 25:16–26:3.) Some "undergraduate students requested a meeting with [Dean Casper] to raise concerns about Dr. Corlett's philosophy courses[, and Dean Casper] decided to meet with these students personally . . . , in part because [she] was already aware of ongoing concerns about Dr. Corlett and in part because the request came from SDSU's Vice President of Affairs and Campus Diversity, Luke Wood." (Casper Decl. ¶ 10.)

Consequently, at midday on March 1, 2022, in a conference room belonging to Student Affairs and Campus Diversity, Dean Casper met with a group of eight to ten students, all but one of whom were from Plaintiff's Philosophy 200 and Philosophy 328

/ / /

classes,[2] (*see* Casper Dep. at 26:3–19; *see also id.* at 18:23–19:1, 91:17–92:2), for approximately 80 minutes, (*see id.* at 48:14–15), regarding Plaintiff's use of language in class, "including rape jokes and . . . highly charged racialized language, including the N word, hard R, multiple times." (*See id.* at 33:24–34:12.) Dean Casper believed "the students who had experienced Professor Corlett's use of rape jokes and rape-related imagery experienced what [she] would describe as gendered harm." (*See id.* at 40:10–13.)

> The students who experienced [Plaintiff's] repeated use of the N-word . . . described, often in tears -- . . . feeling that they were being harmed racially, that they had been singled out, that they had been forced to listen to a term that has a historic negative use in our culture. A few of them cried.

(*Id.* at 40:17–25.) Some of the students shared that they had "asked [Plaintiff] not to use the N word, and he [had] continued to do so." (*See id.* at 88:5–9.) Further, "a couple of students shared that . . . if [the N-word] had been uttered in relation to the course, that would've been different than the multiple times it was uttered[]" during the lecture. (*See id.* at 90:6–16.) Dr. Casper found the students to be "highly credible" based on their sincerity and the consistency of their reports both with one another and with "a pattern of prior student reports about Dr. Corlett." (*See* Casper Decl. ¶ 14.)

After the meeting, at approximately 1:00 p.m. on March 1, 2022, Aneisha Mitchell shared a Google document with Dean Casper that summarized the complaints of "Student 01" and "Student 40" from Plaintiff's Philosophy 200 course:

> On February 28, 2022, SDSU student [Student 01] indicated that during her Phil 200 course with Corlett on February 24, 2022, Corlett repeatedly used the n - word and other racial epithets with a hard r during a use vs mentioning lecture. . . . [W]hen students attempted to get him to refer to that word as the n-word, Corlett allegedly stated that he did not know what the n-word is and encouraged other students to use the actual word instead (nigger). . . . Corlett then started to use the n word with an a at the end in an effort to mimic and imitate his perception of how blacks use the word. Corlett then allegedly

[2] The one student who was not registered for one of Plaintiff's classes had been invited by another registered student to sit in on the March 1, 2022 lecture "for moral support." (*See* Casper Dep. at 26:7–27:7.)

> indicated that he has academic freedom, and because he is tenured, he would have to either kill or rape a student before the university could fire him. . . . Corlett allegedly makes several references to gang rapes in the course as well. . . . [Student 01] is the only black person in the class, and these experiences (because she is both black and a woman) made it difficult for her to learn in this environment and feel safe. . . . [Student 01] requested to be removed from his course and enrolled in a different Phil 200 course with another professor. [Student 01] shared with [Student Affairs and Campus Diversity] that she was afraid to report this experience to others given the language that Corlett has in his syllabus to initiate legal action against students if they share his syllabus and course content outside of the classroom.
>
> On March 1, 2022, [Student 01] shared that because of her experience in her Phil 200 course, she asked a mentor [Student 40] to attend the next class session with her. . . . [Student 40] went to the course, and Corlett asked him who he was and allegedly said something to the effect of he knew why [Student 40] was there, and then started to use the n-word with a hard r over 15 times. Corlett allegedly was yelling and said that he cannot be fired because he has academic freedom and is tenured. . . . [O]ther students started to speak against Corlett using this word and some in favor of him using it.

(*See* ECF No. 53-7 at 112; *see also* Casper Decl. ¶ 13.)

Dean Casper also reviewed Plaintiff's syllabi, (*see* Casper Decl. ¶ 17), which "conveyed a hostile and belittling attitude toward students who might disagree with or be offended by Dr. Corlett, and further invaded language that students might reasonably interpret as threatening." (*Id.* ¶ 16.) Specifically, Plaintiff's Philosophy 200 syllabus for Spring 2022 contained the following "Content and Style Advisory":

> **Due to the sensitive nature of some of the topics that are covered in this course taught at a public adult higher-educational institution[,] which is bound to and protected by federal and state laws as well as the SDSU Senate Policy File, and the manner in which some such topics are sometimes presented or discussed in order to illustrate particular philosophical points or problems related to the course material or sometimes as a provocative pedagogical method in order to provide students with a cognitive "break" by way of cognitive engagement in order to refocus their attention on the material, students are forewarned that the provocative contents of this course, both in the assigned readings and the lectures and discussions, could possibly be construed as being offensive especially by those not having sufficient background in ethics**

> **and philosophy and by those suffering from certain psychological disorders. Students are reminded that they themselves are legal adults and that both established law and the SDSU Senate Policy File most certainly protect such expressions, and that with equal certitude ethics requires students to utilize with due diligence their moral and civic responsibility to judge reasonably the diversity of views presented in this course. There is, of course, *neither a legal nor a moral right to not be offended by mere words and their expression!* So if a student is generally overly offended by certain words being used or mentioned and such offense is likely to cause them undue cognitive dissonance or some other emotional trauma that might interfere with their learning experience, they are *strongly advised to immediately seek enrollment in another course* as SDSU Senate Policy File (2015, p. 47) protects "even offensive speech" in the classroom by any enrolled student or faculty member. Such easily offended students are also advised to seek an appointment with SDSU Counseling & Psychological Services (see note below) for professional assistance with their being able to cope with such matters. There will be no respect shown for the movement of political correctness in this course as it is as a movement morally and legally pernicious. No violations of anyone's legal or moral rights to academic freedom shall be tolerated in this course as whatever is expressed by Professor Corlett herein is fully protected by the First Amendment to the U.S. Constitution and the most recent U.S. Supreme Court cases interpreting it and laws pertaining to academic freedom, including *Cohen v. California* (1971), *Hardy v. Jefferson Community College* (2001), as well as the SDSU Senate Policy File noted above. The quality of a university education and an adult learning experience is greatly contingent on the protections of academic freedom. For more on such matters, see http://rdcu.be/HIFn and http://www.theatlantic.com/magazine/archive/2015/09/the-coddling-of-the-american-mind/399356/. Students are free to exit the classroom as they please during class sessions, SO LONG AS THEY DO SO QUIETLY AND DO NOT DISTURB OTHERS. Students who leave the classroom during class sessions are advised to procure notes from other students for the time that they miss during their absence from class as students are responsible for learning the material covered during class sessions whether present or not in the sessions. Offensiphobia will not be tolerated in this course as it violates the free speech rights of others.**

(ECF No. 53-8 at 108–09 (emphasis in original).)

/ / /

/ / /

After four o'clock that afternoon, Dean Casper spoke with Dr. Barbone regarding

> [her] concerns about the students and what [she] had heard from the students [she] [had] met with earlier that day; the emails that [SDSU] had received from students, as well, who were concerned; [and] the fact that we had had a similar kind of concern and situation in 2021 that had resulted in a meeting between Ronnee and Professor Corlett and the CFA rep.

(*See* Casper Dep. at 21:23–22:17.) Although Dean Casper was only required to speak with Dr. Barbone before reassigning Plaintiff, "as a collaborative leader making a big decision like this," she also consulted with several other people on campus, (*see id.* at 33:11–20), including Provost Hector Ochoa, Vice Provost Tong, Joanna Brooks from the Office of the Provost, CSU counsel Kelly Bendell, Senior Associate Dean Schreiber, and Associate Dean John Puttman. (*See id.* at 20:7–21; *see also* Casper Decl. ¶ 17.) She also informed Dr. Barbone that "[she] had consulted with others and was considering removing [Plaintiff] from the course." (*See* Casper Dep. at 22:18–20.) Dr. Barbone "was concerned," "wasn't surprised by the student concerns," and "had no objections to [Dean Casper's] plan." (*See id.* at 22:21–23:2.) Indeed, Dr. Barbone had spoken with Dean Casper about Dr. Corlett's "performance on several occasions" and "more than any and all other Philosophy faculty combined." (*See* Barbone Decl. ¶ 18.) Further, Dean Casper specifically discussed whether Plaintiff's "language was pedagogically relevant" to his lower-division Philosophy courses with two faculty members in the Philosophy Department, namely, Dr. Barbone and Dr. Esme Murdock. (*See* Casper Dep. at 36:24–37:11.) Ultimately, "nobody [Dean Casper] spoke with on March 1st or prior to that, after [they had] received the email and other complaints, felt that many, many utterances of the N-word was reasonable for the academic standards." (*See id.* at 68:21–24.)

"[B]ased on the students [she] [had] spoke[n] with, the emails that had come through, the student complaints, and Professor Corlett's previous behavior[,]" Dean Casper felt that she "had enough information" to conclude that Plaintiff was ineffective in his teaching of undergraduate students and should be reassigned from those classes for the remainder of the term. (*See id.* at 30:2–21.)

**II. Procedural Background**

Plaintiff instituted this action on January 11, 2024, filing his Complaint against Defendants in their individual and official capacities and alleging four causes of action for (1) retaliation in violation of Plaintiff's First and Fourteenth Amendment rights against both Drs. Tong and Casper, (2) retaliation based on viewpoint in violation of Plaintiff's First and Fourteenth Amendment rights against both Drs. Tong and Casper, (3) violation of Plaintiff's substantive due process rights under the Fourteenth Amendment against Dr. Tong only, and (4) a declaration that both Drs. Tong and Casper had violated the CSU "Freedom of Expression" and "Academic Freedom" Senate Policies. (*See generally* ECF No. 1.)

After answering on February 27, 2024, (*see* ECF No. 8), Defendants moved for judgment on the pleadings. (*See generally* ECF No. 15.) Following oral argument, (*see* ECF No. 23; *see also* ECF No. 26), the Court granted in part and denied in part Defendants' motion. (*See generally* ECF No. 24 (the "1st Dismissal Order").) Specifically, the Court dismissed with prejudice Plaintiff's claims against Defendants in their official capacities, (*see id.* at 52; *see also id.* at 35–37, 42), and Plaintiff's claims for damages against Defendants in their individual capacities, (*see id.* at 52; *see also id.* at 37–42), and the Court dismissed without prejudice Plaintiff's first cause of action to the extent it was predicated on Plaintiff's alleged use of gender slurs in his Spring 2022 Philosophy 512 course, (*see id.* at 52–53; *see also id.* at 42–50); Plaintiff's second cause of action as abandoned, (*see id.* at 53; *see also id.* at 50); Plaintiff's third cause of action in its entirety, (*see id.* at 53; *see also id.* at 50–51); and Plaintiff's fourth cause of action to the extent it was directed to the CSU Senate Policy, (*see id.* at 53; *see also id.* at 51–52).

Because the Court had granted Plaintiff leave to amend, (*see id.* at 53), Plaintiff filed the operative First Amended Complaint against Defendants in their individual capacities only on October 11, 2025, (*see generally* ECF No. 25 ("FAC")), which Defendants answered on October 25, 2025. (*See generally* ECF No. 27.) In his First Amended Complaint, Plaintiff alleges three causes of action for: (1) retaliation in violation of the

First and Fourteenth Amendments based on Dean Casper's reassignment and Provost Tong's suspension of Plaintiff, (*see* FAC ¶¶ 150–55); (2) Dr. Tong's application of SDSU's non-discrimination policy against Plaintiff in violation of the First and Fourteenth Amendments, (*see id.* ¶¶ 156–63); and (3) a declaration that Dean Casper and Provost Tong had violated Plaintiff's rights to free speech and academic freedom under the First Amendment, (*see id.* ¶¶ 164–68).

Defendants again moved for judgment on the pleadings on December 17, 2024. (*See generally* ECF No. 29.) After oral argument, (*see* ECF No. 44; *see also* ECF No. 49), the Court granted in part and denied in part Defendants' motion. (*See generally* ECF No. 45 (the "2d Dismissal Order").) Specifically, the Court dismissed without leave to amend Plaintiff's first cause of action to the extent it was based on Dr. Tong's disciplinary actions in response to Plaintiff's use of the words "pussy" and "bitch" in a derogatory fashion in Philosophy 512, (*see id.* at 16–17; *see also id.* at 6–14); dismissed Plaintiff's second cause of action as duplicative of his first cause of action, (*see id.* at 17; *see also id.* at 14–15); and again dismissed Plaintiff's third cause of action to the extent it was directed to the CSU Senate Policy, (*see id.* at 17; *see also id.* at 15–16). Defendants filed a renewed answer to Plaintiff's surviving causes of action on April 15, 2025. (*See* ECF No. 47.)

After concluding discovery, (*see* ECF No. 51), Defendants filed the instant *Daubert* Motion and Motion for Summary Judgment on January 9, 2026. (*See* ECF Nos. 52 & 53, respectively.) On January 12, 2026, in accordance with Section III.B.6 of the undersigned's Standing Order for Civil Cases, Plaintiff filed an *ex parte* application requesting a consolidated briefing schedule on cross-motions for summary judgment. (*See* ECF No. 54.) The Court granted Plaintiff's request, (*see* ECF No. 55), and Plaintiff's Cross-Motion for Summary Judgment was filed on February 9, 2026. (*See* ECF No. 61.)

## ANALYSIS

### I. Legal Standard

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment as to a claim or defense or part of a claim or defense. Fed. R. Civ. P. 56(a). Summary

judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although materiality is determined by substantive law, "[o]nly disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *see also Anderson*, 477 U.S. at 248. Accordingly, the non-moving party cannot oppose a properly supported

/ / /

summary judgment motion by "rest[ing] upon mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 256.

Where, as here, the Parties have filed cross-motions, the court considers the motions "separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *See SEC v. Feng*, 935 F.3d 721, 728 (9th Cir. 2019).

## II. Analysis

Through the instant cross-motions for summary judgment, each Party seeks summary adjudication in their favor as to Plaintiff's surviving causes of action, which are his first cause of action for First Amendment retaliation based on Dean Corlett's reassignment of Plaintiff from Philosophy 200 and 328 on March 1, 2022, (*see* FAC ¶¶ 152, 154), and his derivative third cause of action under the Declaratory Judgment Act, 28 U.S.C. § 2201, for "a declaration that Defendant[] Monica Casper . . . violated his rights to free speech and academic freedom under the First Amendment." (*See* FAC ¶ 168.)

"To establish a prima facie First Amendment retaliation claim, the plaintiff must prove that (1) []he engaged in protected speech; (2) the defendants took an adverse employment action against h[im]; and (3) h[is] speech was a substantial or motivating factor for the adverse employment action." *Reges v. Cauce*, 175 F.4th 1014, 1028 (9th Cir. 2026) (alterations in original and internal quotation marks omitted) (quoting *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022)). Here, because the Parties briefed only the first of these three elements, (*see generally* ECF Nos. 53, 53-1, 61, 64, 68), the Court will determine whether either Party is entitled to summary judgment on the issue of whether Plaintiff engaged in protected speech.[3]

---

[3] At the hearing, the Court asked Plaintiff's counsel why the Court should not deny Plaintiff's Cross-Motion for Summary Judgment on the basis that Plaintiff had failed to address two elements of his First Amendment retaliation claim. (*See* ECF No. 74.) Plaintiff's counsel responded that "it was understood" that Dean Casper had reassigned Plaintiff from his classes because of his speech and that Defendants should have argued that those elements were in dispute. (*See id.*) As defense counsel noted, however, this is an erroneous understanding of Plaintiff's burden at summary judgment. "As the party with the burden of persuasion at trial, [Plaintiff] must establish 'beyond controversy every essential element of its'

As before, (*see, e.g.*, ECF No. 24 at 42; ECF No. 45 at 12), the Parties agree that the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), governs this analysis. (*See* ECF No. 53-1 ("Defs.' Mem.") at 15; Pl.'s X-MSJ at 8.) Assuming without deciding that Plaintiff's "numerous" mentions of the unexpurgated n-word to teach the use-mention distinction in Philosophy 328 ("Philosophy, Racism & Justice") and on February 24, 2022, and March 1, 2022, in Philosophy 200 ("Critical Thinking and Composition") touched on a matter of public concern under the first prong of *Pickering*, (*see* Jt. Stmt. ¶¶ 13, 23, 24, 59, 60, 63; *see also* Casper Decl. ¶ 11), the Court focuses on the second prong of *Pickering*, under which "the burdens of evidence and persuasion . . . shift to the Defendants to show that the balance of interests justified their adverse employment decision." *Dodge*, 56 F.4th at 776 (quoting *Eng v. Cooley*, 552 F.3d 1062, 1074 (9th Cir. 2009)). At this step in the analysis, "a defendant can avoid liability for retaliation by showing that it had a legitimate administrative interest in suppressing the speech that outweighed the plaintiff's First Amendment rights." *Id.* at 776–77 (citing *Pickering*, 391 U.S. at 568).

> In *Brewster v. B[oard] of Educ[ation]*, 149 F.3d 971, 980–81 (9th Cir. 1998), [the Ninth Circuit] listed five factors for use in the *Pickering* balancing analysis: (1) whether the employee's speech disrupted harmony among co-workers; (2) whether the relationship between the employee and the employer was a close working relationship with frequent contact which required trust and respect in order to be successful; (3) whether the employee's speech interfered with performance of his duties; (4) whether the employee's speech

---

[First Amendment retaliation] claim." *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quoting William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial § 14:124–127 (2001)). Because Plaintiff has failed to do so, the Court necessarily **DENIES** Plaintiff's Cross-Motion for Summary Judgment to the extent it seeks summary adjudication in Plaintiff's favor as to his surviving causes of action. *See, e.g.*, *Indymac Venture, LLC v. Leu Okuda & Doi, Att'ys at L.*, No. CV 14-00263 KJM, 2018 WL 8303379, at *17 (D. Haw. Jan. 31, 2018) ("The Court cannot assume a contract exists; rather, it was Plaintiff's burden to establish that contract. Plaintiff failed to do so. The Court thus finds that Plaintiff fails to carry its burden of production, and Defendant survives summary judgment without needing to produce any evidence." (citing *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000); *Allstate Ins. Co. v. Gadiel*, CV. No. 07-00565 DAE-KSC, 2008 WL 4830847, at *7 (D. Haw. Nov. 7, 2008))).

> was directed to the public or the media or to a governmental colleague; and (5) whether the employee's statements were ultimately determined to be false.

*Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir.), *as amended*, (9th Cir. Oct. 15, 2001).

"In conducting this balancing, courts must give government employers 'wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.'" *Brewster*, 149 F.3d at 979 (alteration in original) (quoting *Connick v. Myers*, 461 U.S. 138, 151 (1983)). "Moreover, public employers need not allege that an employee's expression actually disrupted the workplace; 'reasonable predictions of disruption' are sufficient." *Id.* (quoting *Waters*, 511 U.S. at 673). Nonetheless, "in the context of higher education, the government does not have the same interest in maintaining 'close working relationship[s]' between professors and university leadership." *Reges*, 175 F.4th at 1035 (alteration in original). Indeed, this principle "extends to relationships within the university more broadly," including the relationships between students and professors. *See id.* at 1036.

"The government's burden in proving disruption 'varies with the content of the speech[,]'" and "[t]he more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *Dodge*, 56 F.4th at 782 (quoting *Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992)) (citing *Connick*, 461 U.S. at 150–52). The use of "slurs" is "not speech entitled to the highest constitutional protection." *See Thompson v. Cent. Valley Sch. Dist. No 365*, 163 F.4th 654, 664–65 (9th Cir. 2025) (citing *Hernandez v. City of Phoenix*, 43 F.4th 966, 979 (9th Cir. 2022); *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 345 (4th Cir. 2017)). Accordingly, even though "academic freedom is 'a special concern of the First Amendment[,]'" *Reges*, 175 F.4th at 1027 (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967)) (citing *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)), Defendants do not "face a particularly onerous burden to justify disciplining [Plaintiff] for his [repeated mention of the unexpurgated n-word], given the comparatively low value of his speech." *See*

*Hernandez*, 43 F.4th at 979. "This issue is one of law[,] and a determination is to be made by the court." *Bauer*, 261 F.3d at 784 (quoting *Cochran v. City of L.A.*, 222 F.3d 1195, 1200 (9th Cir. 2000)).

Plaintiff contends that the Ninth Circuit's recent decision in *Reges* is dispositive. (*See* Pl.'s X-MSJ at 27–28.) In *Reges*, the Ninth Circuit reversed a district court's grant of summary judgment on the plaintiff-professor's First Amendment retaliation claim in favor of the defendant-university officials. *See* 175 F.4th at 1028. After the university adopted an official school "land acknowledgment" that it recommended including in course syllabi, a computer science professor included a parody in his course syllabus.[4] *See id.* at 1022–23. The university received several student complaints, and after the school opened a second section of the course led by a different faculty member, approximately 170 of the 500 students transferred into the new section. *See id.* at 1023–25. The university initiated a disciplinary process, during which time a merit pay increase was withheld. *See id.* at 1025–26. The professor therefore sued several of the university's administrators for First Amendment retaliation. *See id.* at 1026. The district court concluded that the professor had spoken on a matter of public concern but granted summary judgment in favor of the defendants because the university's "interest in mitigating disruption to university staff functions, teaching assistants, and the learning environment outweighed [the professor]'s First Amendment interests." *See id.* at 1026–27.

The Ninth Circuit agreed that the professor had "unquestionably spoke[n] on a matter of public concern," *see id.* at 1033, but reversed under the second prong of the *Pickering* analysis. *See id.* at 1035–39. Specifically, the Ninth Circuit reasoned that, "[i]n this case, it is readily apparent that the disruption that occurred at [the university] after [the

---

[4] The university's land acknowledgment read: "The University of Washington acknowledges the Coast Salish peoples of this land, the land which touches the shared waters of all tribes and bands within the Suquamish, Tulalip and Muckleshoot nations." *Reges*, 175 F.4th at 1022. The professor's parody provided: "I acknowledge that by the labor theory of property the Coast Salish people can claim historical ownership of almost none of the land currently occupied by the University of Washington." *Id.* at 1023.

professor] [had] included his land acknowledgment in his Winter 2022 syllabus is attributable to one irreducible source: student discomfort and anger with [the professor]'s views." *See id.* at 1036. The Ninth Circuit held that "student disagreement with a professor's academic speech on an issue of public concern cannot alter the *Pickering* analysis in the government's favor" because "[s]tudent unrest is an inevitable byproduct of our core First Amendment safeguards in the higher education context. *See id.* "Under *Pickering*, therefore, avoiding the disruption on college campuses 'that necessarily accompanies controversial speech,' . . . cannot justify the suppression of the very diversity of views that is central to the mission of higher education." *Id.* (quoting *Dodge*, 56 F.4th at 782). Further, to the extent the university

> argue[d] that it [had] relied on more tangible forms of disruption beyond student unrest, such as Native students dropping out or taking leaves of absence, greater difficulties recruiting Native students, and students in [the professor]'s computer science course switching to the other section that the [professor's school] [had] made available[,] . . . . student unrest that ordinarily accompanies controversial academic speech does not outweigh [the professor]'s First Amendment interests.

*See id.* at 1038 (citing *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975)). In any event, "the disruption alleged on this record suffer[ed] from problems of proof" and was "inadequately substantiated," *see id.*, and "there was "[n]o[] . . . evidence that [the professor]'s land acknowledgment affected the quality of his classroom instruction or denied educational benefits to his students." *See id.* at 1039.

Here, unlike in *Reges*, Dean Casper contends that she reassigned Plaintiff from Philosophy 200 and 328 on the grounds that Plaintiff's "approach was not effective." (Casper Decl. ¶ 15.) Specifically, the students Dean Casper met with on March 1, 2022, reported that Plaintiff's repeated expression of the unexpurgated "n-word" "was a distraction from the course content" and "was instead impeding their ability to learn the course content." (*Id.* ¶ 12.) Ultimately, "the intensity of the students' concerns, as well as the number of students impacted, and the fact that the students were mostly first-year and second-year undergraduate students, led [Dean Casper] to conclude that Dr. Corlett's . . .

approach was not effective." (*Id.* ¶ 15.) This was consistent with the fact that Dean Casper "received substantially more students complaints about Dr. Corlett than [she] received about all other Arts & Letters faculty combined[,]" (*id.* ¶ 6), and that "students withdrew from Dr. Corlett's courses in high numbers[,]" which was "a cause for concern, because (i) it mean[t] that the professor [wa]s not carrying their fair share of the teaching workload; and (ii) it m[ight] be a red flag that students [we]re not responding well to the professor's pedagogical approach." (*Id.* ¶ 7.) By contrast, in *Reges*, the Ninth Circuit emphasized that there was no evidence that the land acknowledgment had "affected the quality of [the plaintiff's] classroom instruction or denied educational benefits to his students." 175 F.4th at 1039. Accordingly, while there was insufficient evidence to substantiate "more tangible forms of disruption beyond student unrest" in *Reges*, *see id.* at 1038, Plaintiff here had a well-documented history of student complaints and withdrawals, (*see* Casper Decl. ¶¶ 6–8), that precipitated more than one intervention from administration and faculty "to address concerns about Dr. Corlett's teaching and behavior in the Philosophy Department."[5] (*See id.* ¶ 9.) Ultimately, Defendants have introduced evidence that, unlike the administrators in *Reges*, Dean Casper's decision to reassign Plaintiff from Philosophy 200 and 328 was based on Plaintiff's inability effectively to teach those classes.

Weighing the actual disruption to effective student instruction in Philosophy 200 and 328 and considering that Plaintiff's repeated utterance of "slurs . . . [is] not speech entitled to the highest constitutional protection," *see Thompson*, 163 F.4th at 664–65 (citing *Hernandez*, 43 F.4th at 979), especially where it "inhibit[ed] his effectiveness as a teacher,"

---

[5] The culmination of complaints against Plaintiff illustrates that Dean Casper's decision to remove Plaintiff from Philosophy 200 and 328 was not simply a reaction to student distress. In *Reges*, the Ninth Circuit noted that the university's assertions of disruption were "significantly undermined" by the fact that the university had allowed the professor to express the same views in other settings and, consequently, it appeared the defendants only had acted on his syllabus because students had become upset. *See* 175 F.4th at 1039. Here, Dean Casper's decision to reassign Plaintiff from only Philosophy 200 and 328, his undergraduate classes, does not weaken the inference of disruption. Instead, it illustrates Plaintiff's failure effectively to teach only those specific courses.

*see Martin v. Parrish*, 805 F.2d 583, 585–86 (5th Cir. 1986), the Court finds that—even viewing the facts most favorably to Plaintiff—no reasonable juror could conclude that Plaintiff's choice to deploy the unexpurgated n-word repeatedly to teach the use-mention distinction outweighed SDSU's interest in "providing effective instruction." (*See* Casper Decl. ¶ 27; ECF No. 53-8 at 35–97 at 10 (Defendants' expert Barbara A. Lee. J.D., Ph.D. opining that "Professor Corlett's repeated use of racial and gender epithets in his philosophy classes was a violation of his responsibilities as a professor, as articulated by the common law of academic freedom . . . and supported by the CSU, SDSU and Faculty Senate policies")); *see also, e.g.*, *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995) ("An instructor's choice of teaching methods does not rise to the level of protected expression." (citing *Hetrick v. Martin*, 480 F.2d 705, 708–09 (6th Cir.), *cert. denied*, 414 U.S. 1075 (1973))); *cf. Jorjani v. N.J. Inst. of Tech.*, 151 F.4th 135, 143 (3d Cir. 2025) (reversing district court's grant of summary judgment in favor of university where "[e]ntirely absent [from the record] is any evidence of specific student protests, upheaval, or unwillingness to abide by university policies"); *Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021) (finding the *Pickering* balancing test favored a professor when there was no suggestion that his speech had "inhibited his duties in the classroom, hampered the operation of the school, or denied [the plaintiff] any educational benefits"). The Court therefore **GRANTS** Defendant's Motion for Summary Judgment. Because the Court has determined that Defendants are entitled to summary judgment without relying on the report of Plaintiff's expert, Nathan Salmon, Ph.D., the Court necessarily **DENIES** Plaintiff's Cross-Motion for Summary Judgment and **DENIES AS MOOT** Defendants' *Daubert* Motion.

**CONCLUSION**

In light of the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 53), **DENIES** Plaintiff's Cross-Motion for Summary Judgment (ECF

/ / /

/ / /

No. 61), and **DENIES AS MOOT** Defendants' *Daubert* Motion (ECF No. 52). The Clerk of Court **SHALL CLOSE** the case.

**IT IS SO ORDERED.**

Dated: September 2, 2026

Honorable Todd W. Robinson
United States District Judge